# PATCH *v.* WHITE.

## ERROR TO THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

Argued November 12, 1885.—Reargued January 13, 14, 1886.—Decided March 1, 1886.

A latent ambiguity in a will, which may be removed by extrinsic evidence, may arise : (1) Either when it names a person as the object of a gift, or a thing as the subject of it, and there are two persons or things that answer such name or description: or (2), when the will contains a misdescription of the object or subject, as where there is no such person or thing in existence; or, if in existence, the person is not the one intended, or the thing does not belong to the testator.

When a careful study of the testator's language, applied to the circumstances by which he was surrounded, discloses an inadvertency or mistake in a description of persons or things in a will, which can be corrected without

adding to the testator's language, and thus making a different will from that left by him, the correction should be made.

A made a will, in which, after saying "and touching [my] worldly estate," "I give, devise and dispose of the same in the following manner," he devised certain specific lots with the buildings thereon, respectively, to each of his near relations, and, amongst others, to his brother H a lot described as "lot numbered 6, in square 403, together with the improvements thereon erected." He then devised to his infant son as follows : "the balance of my real estate, believed to be and to consist in lots numbered six, eight and nine, &c.," describing a number of lots, but not describing lot No. 3, in square 406, hereafter mentioned : *Held*, (1) That the testator intended to dispose of all his real estate, and thought he had done so ; (2) That in the devise to H he believed he was giving him one of his own lots ; (3) That evidence might properly be received to show that the testator did not, and never did, own lot No. 6, in square 403, which had no improvements thereon ; but did own lot No. 3, in square 406, which had a house thereon, occupied by his tenants ; and that this raised a latent ambiguity ; and that this evidence, taken in connection with the context of the will, was sufficient to show that there was an error in the description, and that the lot really devised was lot No. 3, in square 406.

Ejectment. The question at issue was the construction of a will, the principal parts of which are set forth in the opinion of the court. The case was first argued November 12, 1885. The judgment below was affirmed by a divided court, November 26, 1885. On the 14th December this judgment was set aside, and a reargument was ordered, which was made January 13, 14, 1886, by the same counsel.

*Mr. John D. McPherson* and *Mr. Calderon Carlisle* for plaintiff in error, cited *Bradley* v. *Packet Co.*, 13 Pet. 89 ; *Blake* v. *Doherty*, 5 Wheat. 359 ; *Atkinson* v. *Cummins*, 9 How. 479 ; *Reed* v. *Insurance Co.*, 95 U. S. 23 ; *Maryland* v. *Railroad Co.*, 22 Wall. 105 ; *Doe* v. *Hiscocks*, 5 M. & W. 363 ; *Finlay* v. *King*, 3 Pet. 346, 376 ; *Ingles* v. *Trustees*, 3 Pet. 99 ; *Smith* v. *Bell*, 6 Pet. 68 ; *Allen* v. *Allen*, 18 How. 385 ; *King* v. *Ackerman*, 2 Black. 403 ; *Clarke* v. *Boorman*, 18 Wall. 493 ; *Blake* v. *Hawkins*, 98 U. S. 315 ; *Barry* v. *Coombe*, 1 Pet. 639 ; *Allen* v. *Lyons*, 2 Wash. C. C. 475 ; *Rivers' Case*, 1 Atk. 410 ; *Purse* v. *Snaplin*, 1 Atk. 414 ; *Powell* v. *Biddle*, 2 Dall. 70 ; *Calvert* v. *Eden*, 2 Harr. & McH. 279, 349 ; *Doe* v. *Huthwaite*, 3 B. & Ald. 632 ; *Bradshaw* v. *Thompson*, 2 Y. & Coll. Ch.

295; *Doe* v. *Greening*, 3 M. & S. 171; *Newton* v. *Lucas*, 6 Sim. 54; *Miller* v. *Travers*, 8 Bing. 244; *Doe* v. *Roberts*, 5 B. & Ald. 407; *Merrick* v. *Merrick*, 37 Ohio St. 126; *Cleveland* v. *Spilman*, 25 Ind. 95; *Moreland* v. *Brady*, 8 Oregon, 303; *Selwood* v. *Mildmay*, 3 Ves. 306; *Door* v. *Geary*, 1 Ves. Sr. 255; *Pentecost* v. *Ley*, 2 Jac. & Walk. 207; *Clark* v. *Atkyns*, 90 N. C. 629; *Tucker* v. *Seaman's Aid Society*, 7 Met. (Mass.) 188; *Button* v. *American Tract Society*, 23 Vt. 336; *Trustees* v. *Peaselee*, 15 N. H. 317; *Dowsett* v. *Sweet*, Ambler, 175; *Parsons* v. *Parsons*, 1 Ves. Jr. 266; *Smith* v. *Coney*, 6 Ves. 42; *Garth* v. *Meyrick*, 1 Bro. Ch. 30; *Stockdale* v. *Bushby*, Cooper, 229; *Doe* v. *Danvers*, 7 East, 299; *Hampshire* v. *Pearce*, 2 Ves. Sr. 216; *Bradwin* v. *Harper*, Ambler, 374; *Mosely* v. *Massey*, 8 East, 149; *Ex parte Hornby*, 2 Bradford, 420.

*Mr. Walter D. Davidge* (*Mr. J. Holdsworth Gordon* was with him) for defendant in error, cited *Berry* v. *Berry*, 1 Harr. & Johns. 417; *Creswell* v. *Lawson*, 7 G. & J. 227; *Ridgley* v. *Bond*, 18 Maryland, 433; *Saylor* v. *Plaine*, 31 Maryland, 158; *Lingan* v. *Carroll*, 2 Harr. & McH. 328; *Allen* v. *Allen*, 18 How. 385; *Finlay* v. *King*, 3 Pet. 346; *Doe* v. *Buckner*, 6 T. R. 610; *Hayden* v. *Stoughton*, 5 Pick. 528; *Miller* v. *Travers*, 8 Bing. 244; *Doe* v. *Hiscocks*, 5 M. & W. 363; *Webber* v. *Stanley*, 16 C. B. N. S. 698; *Weatherhead* v. *Baskerville*, 11 How. 329; *Mackie* v. *Story*, 93 U. S. 589; *Baylis* v. *Attorney General*, 2 Atk. 239; *Ulrich* v. *Littlefield*, 2 Atk. 372; *Taylor* v. *Richardson*, 2 Drewry, 16; *Shore* v. *Wilson*, 9 Cl. & Fin. 355; *Kurtz* v. *Hibner*, 55 Ill. 514; *Bishop* v. *Morgan*, 80 Ill. 357; *Griscom* v. *Evans*, 11 Vroom. (40 N. J. L.) 402; *West* v. *Lawday*, 11 H. L. Cas. 375; *Drew* v. *Drew*, 28 N. H. (8 Foster) 489; *Beall* v. *Holmes*, 6 Harr. & Johns. 206; *Preston* v. *Evans*, 56 Maryland 476; *Hammond* v. *Hammond*, 8 G. & J. 426; *Dougherty* v. *Monett*, 5 G. & J. 459.

MR. JUSTICE BRADLEY delivered the opinion of the court.

Ejectment for two undivided thirds of a lot of land in Washington City, known on the plats and ground plan of the city as lot No. 3, square 406, fronting 50 feet on E Street north: plea, not guilty. The plaintiff, John Patch, now plaintiff in

error, claims the lot under Henry Walker, devisee of James Walker. The latter died seized of the lot in 1832, and by his last will, dated in September of that year, devised to Henry Walker as follows, to wit: " I bequeath and give to my dearly-beloved brother, Henry Walker, forever, lot numbered six, in square four hundred and three, together with the improvements thereon erected, and appurtenances thereto belonging." The testator did not own lot number 6, in square 403, but did own lot number 3, in square 406, the lot in controversy ; and the question in the cause is, whether the parol evidence offered and by the court provisionally received, was sufficient to control the description of the lot so as to make the will apply to lot number 3, in square 406. The judge at the trial held that it was not, and instructed the jury to find a verdict for the defendant. The court in General Term sustained this ruling and rendered judgment for the defendant ; and that judgment is brought here by writ of error for review upon the bill of exceptions taken at the trial.

The testator, at the time of making his will, and at his death, had living a wife, Ann Sophia, an infant son, James, a mother, Dorcas Walker, three brothers, John, Lewis, and Henry (the latter being only eleven years old), and three sisters, Margaret Peck, Louisa Ballard, and Sarah McCallion, and no other near relations, and all of these are provided for in his will, if the change of description of the lot given to Henry is admissible ; otherwise Henry is unprovided for, except in a residuary bequest of personal property in connection with others. The following are the material clauses of the will. After expressing the ordinary wishes and hopes with regard to the disposal of his body and a future life, the testator adds : " And touching worldly estate, wherewith it has pleased Almighty God to bless me in this life, I give, devise, and dispose of the same in the following manner and form." He then gives and bequeaths to his wife one-third of all his personal estate, forever, and the use of one-third of his real estate for life, remainder to his infant son, James. He then proceeds : " I bequeath and give to my dear and affectionate mother, Dorcas Walker, forever, all of lot numbered seven, in square one hundred and six, as

laid down on the plan of the City of Washington, together with all the improvements thereon erected and appurtenances thereto belonging.

"I bequeath and give to my dearly-beloved brother, John Walker, forever, all of lot numbered six, in square one hundred and six, with the two-story brick house, back building, and all appurtenances thereto belonging.

"I bequeath and give to my dearly-beloved brother, Lewis Walker, forever, lots twenty-three, twenty-four, and twenty-five, in square numbered one hundred and six, together with a two-story brick building, with a basement story back building, and all appurtenances thereto belonging and erected on one or more of said lots.

"I bequeath and give to my dearly-beloved brother, Henry Walker, forever, lot numbered six, in square four hundred and three, together with the improvements thereon erected and appurtenances thereto belonging."

Then, after giving to his three sisters, and his infant son, respectively, other specific lots with houses thereon, he proceeds as follows:

"I also bequeath and give to my infant son, James Walker, forever, the balance of my real estate *believed to be and to consist in* lots numbered six, eight, and nine, with a house, part brick and part frame, erected on one of said lots, in square one hundred and sixteen; lots thirty-one, thirty-two, and thirty-three, in square numbered one hundred and forty, and a slaughter-house erected on one of said lots; lots numbered eight and eleven, in square numbered two hundred and fifty; and lot numbered twenty-eight, in square numbered one hundred and seven; and further, I bequeath and give to my infant son, James Walker, one thousand dollars, to be paid out of my personal estate, and applied at the discretion of his guardian hereinafter appointed, for the education of my son, James Walker." He then adds:

"The balance of my personal estate, whatever it may be, I desire shall be equally divided between my mother, Dorcas Walker, my sister, Sarah McCallion, and my brothers, John, Lewis and Henry Walker."

It is clear from the will itself—

1. That the testator intended to dispose of all his estate.

2. That he believed he had disposed of it all in the clauses prior to the residuary clause, except the specific lots thereby given to his son.

3. That which he gave to his brother, Henry, lot number 6, in square 403, he believed he was giving him one of his own lots. On general principles, he would not have given him a lot which he did not own; and he expressly says, "touching worldly estate, wherewith it has pleased Almighty God to bless *me* in this life, I give, devise, and dispose of *the same* in the *following* manner."

4. That he intended to give a lot with improvements thereon erected.

Now, the parol evidence discloses the fact, that there was an evident misdescription of the lot intended to be devised. It shows, first, as before stated, that the testator, at the time of making his will, and at the time of his death, did not, and never did, own lot 6, in square 403, but did own lot 3, in square 406; secondly, that the former lot had no improvements on it at all, and was located on Ninth Street, between I and K Streets, whilst the latter, which he did own was located on E Street, between Eighth and Ninth Streets, and had a dwelling house on it, and was occupied by the testator's tenants—a circumstance which precludes the idea that he could have overlooked it.

It seems to us that this evidence, taken in connection with the whole tenor of the will, amounts to demonstration as to which lot was in the testator's mind. It raises a latent ambiguity. The question is one of identification between two lots, to determine which was in the testator's mind, whether lot 3, square 406, which he owned, and which had improvements erected thereon, and thus corresponded with the implications of the will, and with part of the description of the lot, and rendered the devise effective; or lot 6, square 403, which he did not own, which had no improvements thereon, and which rendered the devise ineffective.

It is to be borne in mind that all the other property of the

testator, except this one house and lot, was disposed of to his other devisees, at least that was his belief as expressed in his will, and there is no evidence to the contrary; whilst this lot (though he believed he had disposed of it), was not disposed of at all, unless it was devised to his brother, Henry, by the clause in question. In view of all this, and placing ourselves in the situation of the testator at the time of making his will, can we entertain the slightest doubt that he made an error of description, so far as the numbers in question are concerned, when he wrote, or dictated, the clause under consideration? What he meant to devise was a lot that he owned; a lot with improvements on it; a lot that he did not specifically devise to any other of his devisees. Did such a lot exist? If so, what lot was it? We know that such a lot did exist, and only one such lot in the world, and that this lot was the lot in question in this cause, namely, lot number 3, in square 406. Then is it not most clear that the words of the will, "lot numbered six, in square four hundred and three," contained a false description. The testator, evidently by mistake, put "three" for "six," and "six" for "three," a sort of mis-speech to which the human mind is perversely addicted. It is done every day even by painstaking people. Dr. Johnson, in the preface to his Dictionary, well says: "Sudden fits of inadvertence will surprise vigilance, slight avocations will seduce attention, and casual eclipses of the mind will darken learning." Not to allow the correction of such evident slips of attention, when there is evidence by which to correct it, would be to abrogate the old maxim of the law: "*Falsa demonstratio non nocet.*"

It is undoubtedly the general rule, that the maxim just quoted is confined in its application to cases where there is sufficient in the will to identify the subject intended to be devised, independently of the false description, so that the devise would be effectual without it. But why should it not apply in every case where the extrinsic facts disclosed make it a matter of demonstrative certainty that an error has crept into the description, and what that error is? Of course, the contents of the will, read in the light of the surrounding circumstances, must lead up to and demand such correction to be made.

It is settled doctrine that, as a latent ambiguity is only disclosed by extrinsic evidence, it may be removed by extrinsic evidence. Such an ambiguity may arise upon a will, either when it names a person as the object of a gift, or a thing as the subject of it, and there are two persons or things that answer such name or description; or, secondly, it may arise when the will contains a misdescription of the object or subject: as where there is no such person or thing in existence, or, if in existence, the person is not the one intended, or the thing does not belong to the testator. The first kind of ambiguity, where there are two persons or things equally answering the description, may be removed by any evidence that will have that effect, either circumstances, or declarations of the testator. 1 Jarman on Wills, 370; Hawkins on Wills, 9, 10. Where it consists of a misdescription, as before stated, if the misdescription can be struck out, and enough remain in the will to identify the person or thing, the court will deal with it in that way; or, if it is an obvious mistake, will read it as if corrected. The ambiguity in the latter case consists in the repugnancy between the manifest intent of the will and the misdescription of the donee or the subject of the gift. In such a case evidence is always admissible to show the condition of the testator's family and estate, and the circumstances by which he was surrounded at the time of making his will. 1 Jarman on Wills, 364, 365; 1 Roper on Legacies, 297, 4th ed.; 2 Williams on Executors, 988, 1032. Mr. Williams (afterwards Mr. Justice Williams) says: " Where the name or description of a legatee is erroneous, and there is no reasonable doubt as to the person who was intended to be named or described, the mistake shall not disappoint the bequest. The error may be rectified. . . . 1. By the context of the will; 2. To a certain extent by parol evidence. . . . A court may inquire into every material fact relating to the person who claims to be interested under the will, and to the circumstances of the testator, and of his family and affairs, for the purpose of enabling the court to identify the person intended by the testator." pp. 988–989. Again he says, on page 1032: " Mistakes in the description of legacies, like those in the description of

legatees, may be rectified by reference to the terms of the gift, and evidence of extrinsic circumstances, taken together. The error of the testator, says Swinburne, in the proper name of the thing bequeathed, doth not hurt the validity of the legacy, so that the body or substance of the thing bequeathed is certain: As, for instance, the testator bequeaths his horse Criple, when the name of the horse was Tulip; this mistake shall not make the legacy void; for the legatory may have the horse by the last denomination; for the testator's meaning was certain that he should have the horse; if, therefore, he hath the thing devised, it is not material if he hath it by the right or the wrong name." See also Roper on Legacies, 297.

The rule is very distinctly laid down by Sir James Wigram, who says: "A description, though false in part, may, with reference to extrinsic circumstances, be absolutely certain, or at least sufficiently so to enable a court to identify the subject intended; as where a false description is superadded to one which by itself would have been correct. Thus, if a testator devise his black horse, having only a white one, or devise his freehold houses, having only leasehold houses, the white horse in the one case and the leasehold houses in the other would clearly pass. In these cases the substance of the subject intended is certain, and if there is but one such substance, the superadded description, though false, introduces no ambiguity, and, as by the supposition the rejected words are inapplicable to any subject, the court does not alter, vary, or add to the effect of the will by rejecting them." Wigram on Extrinsic Evidence, 53. Of course when the author speaks of the rejected words as being "inapplicable to any subject," he means inapplicable because the subject is not in existence, or does not belong to the testator.

The case of the *Roman Catholic Orphan Asylum* v. *Emmons*, 3 Bradford, 144, which arose before the Surrogate of New York, well illustrates the application of the rule. There a testatrix bequeathed *her* shares of the Mechanics' Bank stock to the Orphan Asylum. She had no bank stock except ten shares of the City Bank. Surrogate Bradford, in a learned opinion, held that the word "Mechanics" must be rejected as inappli-

cable to any property ever owned by the testatrix, and the rejection of this word left the bequest to operate upon any bank stock possessed by her, and so to pass the City Bank shares. See also a learned note of Chief Justice Redfield, 10 Am. Law Reg., N. S. 93, to the case of *Kurtz* v. *Hibner*, 55 Ill. 514, in which he strongly disapproves the decision in that case.

Chief Justice Marshall, in *Finlay* v. *King's Lessee*, 3 Pet. 346, 377, lays down the general rule that underlies all others. "The intent of the testator," says he, "is the cardinal rule in the construction of wills; and if that intent can be clearly perceived, and is not contrary to some positive rule of law, it must prevail; although in giving effect to it some words should be rejected, or so restrained in their application, as materially to change the literal meaning of the particular sentence."

But it is not our intention to review or classify the decisions. They are legion. The intrinsic difficulty of stating the rule as applicable to all cases is such as to make it presumptuous in any one to attempt to chain it down and fix it in the form of a verbal definition. Sufficient appears from the authorities already quoted to show that, whilst no bill in equity lies to reform a will, because its author is dead, and his intent can only be known from the language he has used, when applied to the circumstances by which he was surrounded, yet a careful study of that language and of those circumstances will generally disclose any inadvertency or mistake in the description of persons or things, and the manner in which it should be corrected, without adding anything to the testator's language, and thereby making a different will from that left by him. We will only quote further, an observation of Chief Justice Thompson, of New York, in *Jackson* v. *Sill*, 11 Johns. 201, which is very pertinent to the present discussion. In that case the court rejected the extrinsic evidence offered to remove a supposed latent ambiguity in a will, for the very good reason that it appeared, on examination, that no ambiguity existed. But the Chief Justice justly said: "It is undoubtedly a correct rule in the construction of wills, to look at the whole will for the purpose of ascertaining the intention of the testator in any particular part, where such part is ambiguous. But where the

intention is clear and certain, and no repugnancy appears between the different parts of the will, no such aid is necessary or proper." Of course, in the case of a latent ambiguity such repugnancy can only appear by means of the evidence which discloses the ambiguity.

In view of the principles announced in these authorities, the case under consideration does not require any enlargement of the rule ordinarily laid down, namely, the rule which requires in the will itself sufficient to identify the subject of the gift, after striking out the false description. The will, on its face, taking it altogether, with the clear implications of the context, and without the misleading words, "six" and "three," devises to the testator's brother, Henry, in substance as follows: "I bequeath and give to my dearly beloved brother, Henry Walker, forever, lot number— , in square four hundred and —, together with the improvements thereon erected and appurtenances thereto belonging—being a lot which belongs to me, and not specifically devised to any other person in this my will." In view of what has already been said there cannot be a doubt of the identity of the lot thus devised. It is identified by its ownership, by its having improvements on it, by its being in a square the number of which commenced with four hundred, and by its being the only lot belonging to the testator which he did not otherwise dispose of. By merely striking out the words "six" and "three" from the description of the will, as not applicable (unless interchanged) to any lot which the testator owned; or instead of striking them out, supposing them to have been blurred by accident so as to be illegible, the residue of the description, in view of the context, so exactly applies to the lot in question, that we have no hesitation in saying that it was lawfully devised to Henry Walker.

*The judgment is reversed, and the cause remanded, with directions to award a new trial.*

MR. JUSTICE WOODS, with whom concurred MR. JUSTICE MATTHEWS, MR. JUSTICE GRAY and MR. JUSTICE BLATCHFORD, dissenting.

Mr. Justice Matthews, Mr. Justice Gray, Mr. Justice Blatch-

ford and myself cannot concur in the judgment of the majority of the court.

The suit was an action of ejectment in which the will was offered in evidence to prove the plaintiff's title. The property in controversy was lot three, in square four hundred and six, in the city of Washington. The plaintiff claimed under a devise of lot six, in square four hundred and three. The devise was as follows: "I bequeath to my dearly beloved brother, Henry Walker, forever, lot numbered six, in square four hundred and three, together with the improvements thereon erected and the appurtenances thereto belonging." The devise does not describe the property sued for. Extrinsic evidence to aid the devise was offered by the plaintiff, who insisted that it was admissible for the purpose of removing a latent ambiguity.

Latent ambiguities are of two kinds : first, where the description of the devisee or the property devised is clear upon the face of the will, but it turns out that there are more than one estate or more than one person to which the description applies; and, second, where the devisee or the property devised is imperfectly, or in some respects erroneously, described, so as to leave it doubtful what person or property is meant.

It is clear that if there is any ambiguity in the devise under consideration it belongs to the latter class. But there is no ambiguity. The devise describes the premises as lot six, in square four hundred and three. It is conceded that there is such a lot and square in the city of Washington, and but one; and it is not open to question what precise parcel of land this language of the devise points out. It clearly, and without uncertainty, designates a lot on 9th street, between I and K streets, well known on the map of the city of Washington, whose metes and bounds and area are definitely fixed and platted and recorded. The map referred to was approved by President Washington in 1792, and recorded in 1794. Thousands of copies of it have been engraved and printed. All conveyances of real estate in the city made since it was put on record refer to it; it is one of the muniments of title to all the public and private real estate in the city of Washington, and

it is probably better known than any document on record in the District of Columbia. The accuracy of the description of the lot devised is, therefore, matter of common knowledge, of which the court might even take judicial notice.

Nor is any ambiguity introduced into the description by the words "with the improvements thereon erected and the appurtenances thereto belonging," or by the testimony which was offered to prove that at the date of the will and of the death of the testator the lot described in the devise was unimproved. It is plain that the words "improvements thereon erected" were a conveyancer's phrase of the same nature as the words which immediately followed them, namely, "and the appurtenances thereto belonging," and the whole phrase is simply equivalent to the words "with the improvements and appurtenances." The words "with the improvements thereon erected" were not intended as a part of the description of the premises, which had already been fully and accurately described, but were used, perhaps, as a matter of habit, or perhaps out of abundant but unnecessary caution, to include in the grant improvements that might be put upon the premises between the date of the testator's will and the date when it took effect, namely, at his death. The phrase is one not commonly used to identify the premises, and was not so used in this devise. There is persuasive evidence of this in the will. For in eight other devises of realty the testator particularly describes the character of the improvements. Thus, in the devise to his brother, John Walker, the improvements are described as a "two-story brick house, back building;" in the devise to Lewis Walker as "a two-story brick building, with a basement story back building;" in the devise to Margaret Peck of four lots, as "a two-story frame house erected on lot 27"; in the devise to Louisa Ballard, as a "three-story brick house"; in the devise to Sarah McCallion, as a "frame house;" in the devise to James Walker of two lots, as "two two-story brick houses"; and in the residuary devise to James Walker of the testator's real estate as "a house part brick and part frame," and "a slaughter-house." There is no proof that any of the other real estate mentioned in the will was improved. There is, there-

fore, no doubt about the identity of the lot described in the devise.

But even if the words under discussion were used to carry the idea that the property mentioned in the devise was improved, and it turned out to be unimproved, these facts would not make the description ambiguous or uncertain. For it is a settled rule of construction, that if there be first a certain description of premises, and afterwards another description in general terms, the particular description controls the general. Thus, in *Goodtitle* v. *Southern*, 1 M. & S. 299, it was held that by a devise of " all my farm called Trogues-farm, now in the occupation of C.," the whole farm passed though it was not all in C.'s occupation. See also *Miller* v. *Travers*, 8 Bing. 244; *Goodright* v. *Pears*, 11 East, 58.

Another cognate rule, well settled in the law, is also applicable here, and that is that where there is a sufficient description of premises, a subsequent erroneous addition will not vitiate the description, and we may reject a false demonstration. *Doe* v. *Galloway*, 5 B. & Ad. 43; *Law* v. *Hempstead*, 10 Conn. 23; *Bass* v. *Mitchell*, 22 Texas, 285; *Peck* v. *Mallams*, 10 N. Y. 509, 532; *Abbott* v. *Abbott*, 53 Maine, 356, 360; *Doane* v. *Wilcutt*, 16 Gray, 368, 371; *Jones* v. *Robinson*, 78 N. C. 396; 3 Washburn on Real Property, 629.

Upon these established rules, as well as upon the general sense and practice of mankind, it is beyond controversy that a lot described in the words used in the devise in question would pass either by will or deed, though it should turn out that the lot was unimproved. The description is as particular and precise as if the metes and bounds, the area, and the street on which the lot was situated, and every other particular of size and situation, had been given. The identity of the lot is settled beyond question. Upon the authorities cited the description is not rendered ambiguous or uncertain by the use of the general words " with the improvements erected thereon," even though there be no improvements. It follows that the description of the premises in controversy, contained in the devise, was good and sufficient, and upon well settled rules of law, free from doubt or ambiguity.

It is, therefore, beyond controversy that if the testator had been the owner of lot numbered six, in square four hundred and three, it would have passed by the devise, and the sufficiency of the description could not have been challenged. The only ground, therefore, upon which the plaintiff can base his contention that there is a latent ambiguity in the devise, is his offer to prove that the testator did not own the lot described in the devise, but did own another which he did not dispose of by his will. This does not tend to show a latent ambiguity. It does not tend to impugn the accuracy of the description contained in the devise. It only tends to show a mistake on the part of the testator in drafting his will. This cannot be cured by extrinsic evidence. For, as Mr. Jarman says, "As the law requires wills, both of real and personal estate (with an inconsiderable exception), to be in writing, it cannot, consistently with this doctrine, permit parol evidence to be adduced either to contradict, add to, or explain the contents of such will ; and the principle of this rule evidently demands an inflexible adherence to it, even where the consequence is a partial or total failure of the testator's intended disposition; for it would have been of little avail to require that a will *ab origine* should be in writing, or to fence a testator around with a guard of attesting witnesses, if, when the written instrument failed to make a full and explicit disclosure of his scheme of disposition, its deficiencies might be supplied, or its inaccuracies corrected, from extrinsic sources." 1 Jarman on Wills, 4th and 5th eds., 409.

If there is any proposition settled in the law of wills, it is, that extrinsic evidence is inadmissible to show the intention of the testator, unless it be necessary to explain a latent ambiguity ; and a mere mistake is not a latent ambiguity. Where there is no latent ambiguity there no extrinsic evidence can be received. The following cases support this proposition :·

In *Miller* v. *Travers*, 8 Bing. 244, Tindal, Chief Justice of the Common Pleas, and Lyndhurst, Chief Baron of the Exchequer, were called in to assist Brougham, Lord Chancellor. Their joint opinion was delivered by Tindal, Chief Justice. The case was this : The testator devised all his freehold and real estate in the county of Limerick and city of Limerick.

The testator had no real estate in the county of Limerick, but his real estate consisted of lands in the county of Clare, which were not mentioned in the will, and a small estate in the city of Limerick, inadequate to meet the charges in the will. The devisee offered to show by parol evidence that the estates in the county of Clare were inserted in the devise to him, in the first draft of the will, which was sent to a conveyancer to make certain alterations not affecting those estates; that by mistake he erased the words " county of Clare," and that the testator, after keeping the will by him for some time, executed it without adverting to the alteration as to that county. The case was considered on the assumption that the extrinsic evidence, if admitted, would show that the county of Clare was omitted by mistake, and that the land in that county was intended to be included in the devise. But the evidence was held inadmissible to show that the testator intended to devise property which had been omitted by mistake.

So in *Box* v. *Barrett*, Law Rep. 3 Eq. 244, 249, Lord Romilly, Master of the Rolls, said: " because the testator has made a mistake you cannot afterwards remodel the will and make it that which you suppose he intended, and as he would have drawn it if he had known the incorrectness of his supposition."

In *Jackson* v. *Sill*, 11 Johns. 201, 212, which was an action of ejectment, the defendant claimed under the following devise to the testator's wife : " I also give to my said beloved wife the farm which I now occupy, together with the whole crops," &c. In a subsequent part of his will the testator mentioned said premises as his lands. It turned out that the premises in controversy were, at the time the will was made, and at the death of the testator, in the possession of one Salisbury under a lease for seven years. The plaintiff offered testimony to show that the testator intended to devise the premises as a part of the farm which he occupied himself and of which he died possessed. Chief Justice Thompson, afterwards a Justice of this court, in delivering judgment, said : " I think it unnecessary to notice particularly the evidence offered ; for it is obvious that, if it was competent, especially that of Mr. Van Vechten, it would

have shown that the premises were intended by the testator to be devised to the defendant Sill. The will was drawn, however, by Mr. Van Vechten under a misapprehension of facts, and under a belief that the testator was in the actual possession of the premises. It is, therefore, a clear case of *mistake*, as I apprehend, and under this belief I have industriously searched for some principle that would bear me out in letting in the evidence offered; but I have searched in vain, and am satisfied the testimony cannot be admitted in a court of law, without violating the wise and salutary provisions of the statute of wills, and breaking down what have been considered the great landmarks of the law on this subject."

In *Tucker* v. *Seaman's Aid Society*, 7 Met. (Mass.) 188, the testator gave a legacy to the "Seaman's Aid Society in the City of Boston," which was the correct name of the society. The legacy was claimed, however, by another society called the Seaman's Friend Society. Chief Justice Shaw, in stating the case, said : " It is also, we think, well proved by the circumstances which preceded and attended the execution of the will, as shown by extrinsic evidence, that it was the intention of the testator to make the bequest in question to the 'Seaman's Friend Society,' and at the time of the execution of the will he believed he had done so ;" "that the testator was led into this mistake by erroneous information honestly given to him by Mr. Baker who drew his will; " " that the testator acted on this erroneous information—erroneous as to his real purpose, as it now appears by the evidence—and made the bequest to the Seaman's Aid Society by their precise name and designation." The court, therefore, held that there was simply a mistake and no latent ambiguity, and that extrinsic evidence was inadmissible.

It is unnecessary to extend this opinion by other extracts from the adjudged cases. The quotations we have made are from masters of the law. The following additional authorities will be found to sustain the proposition we have stated: *Cheyney's Case*, 5 Rep. 68 ; *Doe* v. *Oxenden*, 3 Taunt. 147; *Smith* v. *Maitland*, 1 Ves. Jr. 362; *Chambers* v. *Minchin*, 4 Ves. 675, and note; *Doe* v. *Westlake*, 4 B. & Ald. 57; *Newburgh* v. *New*

*burgh,* 5 Madd. 364; *Clementson* v. *Gandy,* 1 Keen, 309; *Brown* v. *Saltonstall,* 3 Met. (Mass.) 423, 426; *Mann* v. *Mann,* 1 Johns. Ch. 231; *Yates* v. *Cole,* 1 Jones Eq. (N. C.) 110; *Walston* v. *White,* 5 Maryland, 297; *Cesar* v. *Chew,* 7 G. & J. 127; *Fitzpatrick* v. *Fitzpatrick,* 36 Iowa, 674; *Kurtz* v. *Hibner,* 55 Ill. 514.

Our conclusion is, therefore, that, as the evidence offered and rejected was for the purpose of explaining a latent ambiguity when there was no ambiguity, either latent or patent, it was properly rejected.

The opinion of the court in this case allows, what seems to us to be an unambiguous devise, to be amended by striking out a sufficient description of the premises devised, and the blank thus made to be filled by ingenious conjectures based on extrinsic evidence. This is in the face of the statute of frauds in force in the District of Columbia, where the premises in controversy are situate. Fifty years after the unequivocal devise in question, as written and executed by the testator, had, as required by law, been placed upon the records of the District for the information of subsequent purchasers and incumbrancers, it is allowed to be erased, and, by argument and inference, a new one substituted in its place. This is not construing the will of the testator; it is making a will for him.

The decision of the court subjects the title of real estate to all the chances, the uncertainty, and the fraud attending the admission of parol testimony, in order to give effect to what the court thinks was the intention of the testator, but which he failed to express in the manner required by law.