NORA MATTINGLY BURNHAM ET AL., APPELLANTS, V.
CHARLES W. BENNISON ET AL., APPELLEES AND
CROSS-APPELLEES: ELIAS MATTINGLY, CROSS-
APPELLANT.

FILED MARCH 2, 1934.   No. 28645.

*James E. Brittain* and *Deutsch & Stevens,* for appellants.

*Perry, Van Pelt & Marti* and *L. B. Fuller,* for cross-appellant Mattingly.

*Thomas & Vail, contra.*

Heard before GOSS, C. J., GOOD, EBERLY, DAY and PAINE, JJ., and BEGLEY and MEYER, District Judges.

MEYER, District Judge.

George W. Mattingly, colored, died testate, in Butler county, Nebraska, April 17, 1924. His will, dated March 24, 1924, was duly probated in said county. April 16, 1926, plaintiffs commenced an action in the district court for Butler county, Nebraska, to enforce the provisions of a testamentary trust, provided in said will. Issues were joined and on April 28, 1930, trial on the merits having commenced, defendants interposed a demurrer *ore tenus,* which was sustained. Plaintiffs electing to stand upon their petition and refusing to plead further, the petition was dismissed. Plaintiffs appealed to this court, and in *Burnham v. Bennison,* 121 Neb. 291, the judgment of the lower court was reversed, with directions.

Plaintiffs, by permission, filed an amended and supplemental petition in which is set out a copy of said will. The residuary clause thereof, so far as is material to this controversy, provided: "(6) The rest, residue and re-

mainder of my estate, real and personal, wheresoever situated, I give, devise and bequeath to C. W. Bennison and I. T. McCaskey as trustees, upon the following trusts, to wit: (a) That my said trustees shall pay to Joseph Mattingly, a son of a half-brother of my father, the sum of $10,000, on condition and in the event that the said Mattingly is living at my death and appears and makes due proof of his identity to my said trustees within one year after my death; and if the said Joseph Mattingly is dead or fails to appear then and in that event such payment shall be made to his living children, if any he has, on condition and in event that his child or children appear and make due proof to said trustees of their relationship within two years after my death; and if the said Joseph Mattingly fails so to appear and make such proof within one year, and if also, his child or children fail to so appear and make proof of their relationship within two years after my death, then the provisions of this paragraph made shall lapse and be null and void. (b) That my said trustees shall pay Elias Mattingly, the son of a half-brother of my father, the sum of $10,000, if the said Elias Mattingly is living at my death and he appear and make due proof of his relationship to said trustees within one year after my death; and if the said Elias Mattingly is dead or in case he fail to make the aforesaid proof and appearance then my said trustees shall pay said sum to his child or children, if any there are, appearing and making proof to said trustees of his or their relationship within two years after my death and in case of the said Elias Mattingly dying or failing to appear and in case of his child or children, if any he has, failing to appear and make proof as aforesaid, then and in that event the provisions of this paragraph in behalf of said Elias Mattingly and his child or children shall automatically lapse and be null and void. (c) My said trustees shall, during the term of said trust, cumulate the net income of said estate until the two-year period after my death has elapsed and my said trustees are then directed to assign, transfer and

set over to C. W. Bennison and I. T. McCaskey of David City, Nebraska, in equal shares, the rest, residue and remainder of the property remaining in the hands of said trustees and to vest in the said C. W. Bennison and I. T. McCaskey the absolute title thereto; my intention being to give, bequeath and devise to said C. W. Bennison and I. T. McCaskey all of such residue absolutely and unconditionally."

Plaintiffs aver in substance that the Joseph Mattingly mentioned, described and intended under the provisions of section (a) of paragraph (6) of said will (if alive) died March 19, 1919; that plaintiffs are his only children (or descendants); that within the two-year period prescribed, plaintiffs appeared before the trustees named and tendered competent evidence and proof thereof; that the trustees have failed and still fail and decline to receive or hear said proof and fail to determine the facts as contemplated; that on the last day of the two-year period designated, plaintiffs filed their petition in this action, and that said trustees have an interest in said estate adverse to said trust and are not suitable persons to act as trustees.

In December, 1931, Elias Mattingly intervened, alleging that there is a latent ambiguity in paragraph (6) of said will in that Elias Mattingly is therein described as a son of a half-brother of testator's father instead of a son of an uncle of testator; that testator's father had no brother or half-brother at any time, and intervener says he is the person named and intended under section (b) of paragraph (6) of said will.

In their answer, defendants admitted that the plaintiffs are the children of Joseph Mattingly, now deceased, and alleged that the testator firmly believed that Joseph Mattingly was the son of a half-brother of the father of testator, but allege that he was not related to the testator in any manner and that deceased's father never had a brother or a half-brother; that said bequests were intended solely for such persons as were related to the

testator in the manner described and that the existence of such blood relationship is a condition precedent to the right of any beneficiary to take such bequest. They further say that, if plaintiffs are the persons referred to in said will, said provision is null and void, for the reason that same was induced by fraud and deceit practiced on the testator by the plaintiffs and their father and their fraudulent failure to disclose their lack of relationship to him.

At the trial below the court found for defendants. Plaintiffs and intervener have appealed.

Are claimants the parties named, described and intended as beneficiaries?

The record is voluminous. It discloses that the testator was an ex-slave, born in Kentucky in 1841. His mother was a negro slave named Jane, owned by one Ray, and his father was a negro named Pius, originally owned as a slave by William Mattingly, but subsequently manumitted. The mother of Pius was a negro slave owned by said William Mattingly and the father was reputed to be a Charles Mattingly, a white man. Testator enlisted in the federal forces during the Civil War under the name of George W. Ray and apparently continued to use his mother's name until about the time he came to Nebraska. In 1878 he had removed to Butler county where he continued to reside until his death. He married in 1887 and in 1908 his wife died. There were no children. At the time of his death he owned real estate and personal property of considerable value.

Joseph Mattingly, father of plaintiffs, was also born in Kentucky about 1849 and was raised in a Louisville, Kentucky, orphanage. He was a white man, but little is known of his parentage. Despite the racial difference, the claimed relationship was not impossible in view of the irregular parentage of George's father and Charles' propensities. A son of Charles Mattingly by another woman would have been a half-brother of testator's father and, had he had a son, such son, if white, would answer

the designated relationship. While it is disputed, the plaintiff Noah Mattingly testified that testator and his father knew each other in Kentucky following the Civil War. Shortly after becoming of age, Joseph Mattingly went to Indiana where he was married. Afterwards he lived in Illinois and in the early nineties moved to Butler county, Nebraska. For a time he leased testator's farm and testator often visited Joseph and had meals with him and his family at their home. In 1895 or 1896 Joseph moved to Council Bluffs, at which time testator gave him $400. Later, Noah Mattingly made several trips to Butler county in connection with his employment and visited the testator at his home, and just before Noah was married testator gave him a mare. Although unable to read or write, testator occasionally corresponded with Joseph and his family through defendant Bennison and he often talked to Josh and Blanch Coleman, with whom he lived, and others, about Joseph and the children and called and referred to them as his cousins and, as they say, told about the good times they had had together when they used to live on his farm. He also told Noah a number of times that they were related and that some time he would disclose the relationship and that he was going to take care of Noah's father and his children.

As against this evidence, Noah testified on cross-examination that he and his family never claimed to be related to testator. Subsequently, however, as a part of the same cross-examination, when asked why he visited George so often and if it was because he thought he was his cousin, Noah said, "Well, I always figured that he was some relation to me." Considering his entire evidence, we do not understand that he intended to disclaim such relationship. It is easily understandable that white persons would be hesitant about claiming relationship to a negro.

There is, however, evidence in depositions of residents of Kentucky introduced by the intervener, and some of which were reoffered by the defendants, to the effect that

Charles Mattingly, although married, never had a white son. The deposition evidence discloses that, if Joseph Mattingly did not bear the claimed relationship, there never was any such person as the one described, and it is practically conceded by defendants that plaintiffs' father is the person named and intended. A latent ambiguity resulting from what may be an erroneous description of relationship is thus indicated and the question arises whether the legatee was in fact erroneously described. A latent ambiguity will arise upon a will when it contains an erroneous description of the person named as legatee, as where there is no such person as the one described, unless from an examination of the whole will it clearly appears that the testator intended that such legatee answer the precise description therein set out as a condition precedent to recovery. See *Second United Presbyterian Church v. First United Presbyterian Church,* 71 Neb. 563; *Patch v. White,* 117 U. S. 210; *In re Henrikson's Estate,* 163 Minn. 176. Also see *Siegley v. Simpson,* 73 Wash. 69, 47 L. R. A. n. s. 514, and notes. These same authorities hold that in cases of latent ambiguity extrinsic evidence may be considered both to disclose and remove such ambiguity. See, also, 40 Cyc. 1430; *St. James Orphan Asylum v. Shelby,* 75 Neb. 591; *Taylor v. McCowen,* 154 Cal. 798.

The parol evidence further shows that in 1919 the deceased made a will in which he conveyed one-half his estate in trust for his brother, John Ray, on condition that, if he be not found within two years, then to Joseph Mattingly, "who formerly lived on my farm, in this, the county of Butler, state of Nebraska." No other Joseph Mattingly ever lived there. Later testator went to Kentucky in an attempt to find his brother. Being unsuccessful and apparently giving him up as dead, he subsequently made the will in question. It also appears that, after leaving Council Bluffs, Joseph Mattingly lived near Sholes in northeastern Nebraska, and testator told the scrivener who drew his will that Joseph Mattingly who

lived on the Dakota line was the son of a half-brother of his father, and when section (a) of the will was read to him, the testator, upon inquiry, referred to Joseph Mattingly as "first cousin in north Nebraska or Dakota." But defendants urge that plaintiffs' father was not the Joseph Mattingly intended because testator knew that Joseph was dead at the time he made his will. He had been told of Joseph's death, but he forgot or became uncertain on this point during his last days. He was then 83 years old and in ill health. Uncertainty is indicated by the fact that he made the bequest over to Joseph's children. Defendants, however, are estopped to urge this objection by reason of their answer, and, indeed, in their brief they state: "The fact that the testator believed he was related by blood to the plaintiffs and their father was not a disputed issue in the case."

Elias Mattingly, intervener, is a son of one Henry F. Mattingly, a brother of Charles, the father of Pius. He is also white and was born in Kentucky in 1840 and he and deceased lived in houses a short distance apart. They were baptized in the same church, played and worked together as boys and young men, and Elias still lives in the same house where he was born. Deceased told Crosthwaite, one of the attesting witnesses, that Elias Mattingly named therein lived back in Kentucky. He also told the Colemans that he had a cousin in Kentucky, and told others he was part white. Testator was illiterate; he had not been in close touch with his relatives for years; his father's birth was irregular and he might easily have been mistaken as to the precise relationship. There is no evidence that he ever knew any other Joseph or Elias Mattingly or that any others ever existed either in Nebraska or Kentucky or elsewhere. Deceased has now been dead nearly ten years and there is no other Joseph or Elias Mattingly or any one of any other name or relationship claiming either of these legacies. The defendant trustees alone ask for their forfeiture. These defendants were testator's business advisors. They are not

relatives, but are residuary legatees and would profit thereby. If we exclude the plaintiffs, Elias Mattingly was testator's nearest living relative. The evidence of the surrounding circumstances, taken in connection with the will itself, leads inevitably to the conclusion that both plaintiffs' father and intervener were the persons named and intended by testator as the objects of his bounty and it is undisputed that plaintiffs are Joseph's only children and descendants.

Did testator by the conditional provisions stated in the will intend that legatees establish the precise relationship therein set out as a condition precedent to recovery, and was relationship the sole motive for said bequest? The will does not so state, nor do we think that this was what testator meant by the language used. Joseph Mattingly was only required to establish his "identity," while Elias Mattingly was required to establish his "relationship." The word identity is not synonymous with the word relationship, nor is it commonly so used, and where two words of a different meaning are used in the same instrument, they are presumed to have been used advisedly and not synonymously. Again, even if relationship was the sole motive, when it is admitted that testator "firmly believed" that Joseph Mattingly was a relative, and there is no evidence that there was any doubt in his mind on this point, why would he require proof of relationship in which he had full faith?

Plaintiffs are required to make proof of their relationship, but since testator believed thoroughly in said relationship, we think he meant only that they establish their relationship to Joseph. This construction does no violence to the language used. Elias' relationship is not disputed, but defendants contend that claimants must prove the exact relationship described in the will. Had the language been "such identity" and "such relationship" instead of "his identity" and "his relationship," or had he made these gifts on the condition that they prove

themselves to be sons "of a half-brother of my father," then the situation might be different.

The scrivener who drew the will said that testator "wasn't a versatile fellow; his mind was slow and he didn't talk much; everything I got out of him I had to inquire about pretty much." He also stated that he "pressed" testator for the relationship in order to get a description of who was actually intended and that he "tried to search out from him who they were and how they could be identified." He made a memorandum of the evidence gleaned for the purpose of drawing the will. There is no suggestion in it of any conditions precedent to the payment of the money, nor does it even disclose the relationship described in the will. The language used was the scrivener's language, and while testator adopted it, the surrounding circumstances support the foregoing construction.

The evidence tends to show that the motive for the legacy to Elias was that of relationship. However, it does not indicate that testator attached a peculiar importance to the precise relationship or that he would not have made said gift had he had it in mind that Elias was a son of a great uncle rather than a son of a half-brother of his father. There had been a rather close association between testator and Joseph for a considerable period of time, and while in making the gift to him there is evidence he was actuated by a belief of relationship, we are unable to determine that this was his sole motive. He remembered others who were not related and we cannot say that, aside from such relationship or his belief in it, he would have preferred this legacy to go to the residuary legatees, who it is admitted bear no relationship. We believe there is a latent ambiguity arising on the will resulting from an erroneous description. This renders parol testimony admissible, and the rule stated in *Patch v. White, supra,* and quoted with approval in *In re Henrikson's Estate, supra,* is applicable here: "If the misdescription can be struck out, and enough remain in the

will to identify the person or thing, the court will deal with it in that way; or, if it is an obvious mistake, will read it as if corrected." See, also, *Seebrock v. Fedawa*, 33 Neb. 413; Jones, Evidence (2d ed.) sec. 474.

We next consider whether plaintiffs and their father fraudulently induced testator to believe they were related and to make the bequest to them. Defendants admit there is no direct evidence of fraud, but point out that, when testator told Noah that they were related, he did not deny it, and they say that this and the fact that he visited testator and the course of conduct of plaintiffs and their father indicate a studied effort to induce testator to believe they were related and to make a bequest to them and to conceal the true facts. We think the evidence insufficient to establish such design, nor does it show that testator was influenced by their conduct. None of them except Noah saw testator after 1896. Thereafter he was in Kentucky seeking out his relatives. Apparently his belief in such relationship was of long standing. The only assertions of relationship in the record were made by testator himself. There is nothing to show that Joseph or any plaintiff ever made any such statement or representation either in writing or otherwise. Their correspondence with testator passed through the hands of the defendant Bennison and there is no suggestion that there was anything in it to support this charge. "Fraud is never presumed, but must be established by the party alleging it by clear and satisfactory evidence." *Hampton v. Webster*, 56 Neb. 628.

As a general rule, to establish concealment, it must first be shown that the parties charged therewith had knowledge of the facts which it is claimed they concealed or means of knowledge which are not open to both parties alike. 12 R. C. L. 309, sec. 69. Except for Noah's statement earlier discussed, there is no evidence that plaintiffs or their father knew or believed that they were not related and in their petition plaintiffs allege they were related. The evidence indicates testator's means of knowl-

edge was superior to theirs. The trial court found specially for plaintiffs on this issue and with this finding we agree.

Next we consider certain cross-assignments of error. In their answer to the petition in intervention, plaintiffs allege that intervener's claim, if any, had been settled, and that such petition was filed in furtherance of a conspiracy with defendants to harass plaintiffs and defeat their claim. It is noted that defendants did not object to intervener's evidence and they have not answered his brief in this court. It is also shown that negotiations were had looking toward adjustment of his claim, but it does not appear that settlement was reached. While the record reflects many circumstances indicating some favoritism, it fails to show that intervener's petition is not presented in entire good faith.

As heretofore stated, certain depositions were offered by intervener in support of his claim and some of them were reoffered by defendants. Plaintiffs complain that these depositions were improperly received under either offer, over their objections stated at the time of trial, to wit: That said depositions were not taken in the instant case, but were taken in other cases involving different parties and issues, cases in which plaintiffs had no substantial interest and no opportunity to cross-examine, and other grounds. Intervener and defendants, on the other hand, contend that the depositions were all taken in former suits involving substantially the same parties or their privies and the same subject-matter and were therefore competent. The defendants did not object to these depositions when offered by intervener. They were therefore properly received in evidence and entitled to be considered in support of intervener's claim as against the defendants.

Plaintiffs first complain of these depositions because of their possible adverse effect on plaintiffs' claim. The only evidence in them that could be considered detrimental to plaintiffs was the evidence, previously referred to, tending to establish that plaintiffs' father did not bear the

relationship to the testator described in the will. However, as already shown, if their admission under either offer was erroneous because of such evidence, it was error without prejudice. Plaintiffs' second and chief reason for urging the incompetency of these depositions lies in the claim that sufficient funds may not be realized from said estate to pay both legacies in full. While their objections are urged with considerable insistency and they outstrip defendants in their resistance of intervener's proof, their position on this phase of the controversy is frankly indicated by the following statement as it appears in their brief: "Except for the depletion of the fund and such adverse testimony as may be reflected in these exhibits, there is no controversy between cross-appellant and the appellants." The pleadings raise no issue between plaintiff and intervener other than the issue based on the claim that intervener's petition was not filed in good faith, heretofore discussed, nor does the will itself reflect a conflict of interest between them. Counsel in their brief state that the question of priority is not involved in this action and the right to intervene was not questioned. It should also be noted that plaintiffs' objection to these depositions when they were offered at the trial did not include the grounds now urged, nor does the evidence establish that there will be a deficiency of funds. We do not think, then, that the plaintiffs are entitled, under the record, to resist the allowance of intervener's claim or to object to evidence in support thereof; mere cross-denials were not sufficient to raise an issue between them. There is no error in the record on this point of which the plaintiffs can rightfully complain.

Have plaintiffs and intervener complied with the requirements of said will to appear and submit proof within two years and one year, respectively, after testator's death?

The evidence discloses that several times prior to the expiration of the two-year period, plaintiffs offered, both orally and in writing, to appear before trustees at any

time convenient to them and make proof as required by said will, and vigorously urged that they be given an opportunity to do so. Each offer was ignored and trustees never did appoint a time or place for hearing and never did hear proof under such claim, but finally, through their attorney, suggested that plaintiffs go into court and establish their identity. As stated in the former opinion, *Burnham v. Bennison, supra:* "When the evidence and proof were tendered within the two-year period, it was the plain duty of the trustees to hear the same and proceed as contemplated by the testator." These same trustees would, as individuals, succeed to the bequest in the event of a forfeiture for failure to comply with the conditional requirements. Their actions smack of self-interest and, even if their failure to act was prompted by an honest belief that plaintiffs were not the parties intended under said will, yet it would seem that plaintiffs' interests ought not be adversely affected by their erroneous judgment and that they ought not be permitted to profit by their own wrong.

This is a suit in equity to enforce a trust under a will, and not a suit against an executor to recover a legacy. If real estate is devised, subject to a condition precedent, which becomes impossible of performance before the time of performance arises, the title to it will not vest in the devisee. However, it is held otherwise as to a legacy subject to a condition precedent. See *Nunnery v. Carter,* 5 Jones Eq. (N. Car.) 370, 78 Am. Dec. 231; *Burdis v. Burdis,* 96 Va. 81. And in *Harris v. Wright,* 118 N. Car. 422, where there was a devise of real property, it was held that one should not be allowed to defeat an interest under a will where by his own wrongful act he prevented claimant from performing the condition upon which his interest rested. The court said: "We are not weakening that principle of law" which requires unconditional performance of conditions precedent, "but we are asserting another rule equally as old and equally as binding when we declare that, where a person interested wrongfully

prevents the performance of the condition precedent, he shall not be allowed to take advantage of his own wrong." See, also, *Morris v. Mull,* 110 Ohio St. 623, 39 A. L. R. 323; *Hill v. Gianelli,* 221 Ill. 286; *Peek v. Woman's Home Missionary Society,* 304 Ill. 427, 26 A. L. R. 917; *Seeley v. Hincks,* 65 Conn. 1. In the latter case the court said that, plaintiff therein being ready and willing to do what was required of him, but being prevented from so doing by the executors, it was accounted to him as performance. The rules quoted, we think, are peculiarly applicable to the facts of this case, and plaintiffs now having made proof that they were the parties intended and having been prevented from appearing and making such proof within the time required, by trustees who would profit thereby, it will be "accounted to them as performance."

So far as intervener is concerned, it appears that a number of contests were originally filed against this will, and the trustees, as proponents thereof and beneficiaries thereunder, within the one-year period caused intervener to appear and give evidence in the form of deposition for use in their behalf in said contest; that he then testified as to his identity and relationship to testator and gave the family history of deceased. There also appears in evidence an envelope directed to "C. W. Bennison and I. T. McCaskey, Executors and Trustees, David City, Nebraska," duly stamped and canceled and postmarked in Kentucky and showing post office cancelation, "David City, Nebraska, April 3, 1925, Registered," and also an affidavit of claim of Elias Mattingly apparently transmitted in the envelope, dated April 1, 1925, in which is set forth proof of his relationship and his identity. The defendant Bennison testified that he turned over all papers in connection with the trust to his counsel, and counsel testified that he was familiar with the contents of said exhibit and saw it among the files in the county court. The foundation proof for the admission of the envelope and affidavit was very meagre; however, defendants did not object thereto, and, for reasons heretofore stated,

plaintiffs' objections cannot be urged. The evidence will therefore be received and considered, and shows *prima facie* that this proof was made within the time required. The proof was ample, and we think that, when intervener appeared at instance of trustees and gave his deposition for them as outlined, and supplemented same by proof and formal claim in the form of affidavit, he fulfilled, within time, the conditional requirements.

Trustees are also charged with breach of trust, and judgment is asked against them personally, as well as against the trust estate, and claim is made against each for interest. In *Lewis v. Barkley*, 91 Neb. 127, it was held that, whether interest is to be allowed upon a specific legacy of money depends upon the intention of the testator, and that, if the intention cannot be otherwise determined from the language of the will, it will be presumed that the testator intended that the legacy should be paid during the first year after the appointment of the executor under the will, and if not so paid, should bear interest from that time. In the instant case there is nothing to indicate testator intended the bequests to draw interest before they were demandable and the will clearly shows that he expected payment to be made within two years following his death. However, there was litigation pending over this will almost continuously to November 12, 1929. This was not contemplated by testator. By January 1, 1931, at least, trustees could have reduced the estate to possession and converted it into cash and have been prepared to pay these bequests. Under the circumstances of this case, such time is allowed and interest is therefore charged at 7 per cent. on each legacy from January 1, 1931.

As pointed out in the former opinion, there was a conflict of interest between trustees and claimants. If trustees desired to assume the role of contestants, they should have resigned and petitioned the court for appointment of successors to hear and determine claims. Choosing to act as trustees, it was clearly their duty to reduce the estate

to possession as soon as possible after the death of the testator and either hear and fairly determine the evidence offered by plaintiffs and intervener or secure a judicial determination thereof. Had this been promptly done, the bequests could have been paid at least by January 1, 1931, as outlined above. After litigation was ended in 1929, there was no further excuse for their failure to act; however, in the role of contestants they have continued to unduly delay an early determination of claimants' rights. Even if not prompted by ulterior purpose or personal interest, they have woefully neglected their duties as trustees and they are personally liable for any resulting loss. 39 Cyc. 321; *Kline's Estate*, 280 Pa. St. 41, 32 A. L. R. 926; *Baird v. Lane*, 115 Neb. 413. We have examined the evidence carefully and are unable to determine that there has been any loss to the estate by their neglect, except perhaps a possible loss of interest due to delay, for which interest they are chargeable in the event of a deficiency in the trust estate. If sufficient funds cannot be realized from the trust estate to pay the face of the bequests in full, then the interest chargeable to trustees should be computed on the principal payable.

Trustees are not only liable for interest, but they may not be permitted to charge the trust estate, to the prejudice of the claimants, for any expenses, costs, or attorneys' fees incurred in this litigation, or for any expense, costs, or attorneys' fees incurred or services performed by them in their individual interest, rather than in the interest of the trust.

After the hearing in the trial court, by suggestion of counsel for trustees, and in keeping with the mandate of this court made on former hearing, the trial court entered an order appointing new trustees and removing those originally designated. Plaintiffs complain that the newly appointed trustees are disqualified by interest to act, and that their appointment was made without notice to plaintiffs. While the trustees appointed should clearly be impartial between all the parties, the record does not dis-

close that the newly appointed trustees lack such quali-
fications, and we fail to find in the record any evidence
on the question of notice, but if notice was omitted no
prejudice appears. Under the state of the record, we
do not think we should disturb the order of the trial court
in this regard.

It follows that the judgment of the trial court must be
and the same hereby is reversed and the cause remanded
to the district court, with instructions to enter judgment
in conformity with this opinion.

REVERSED.

GOOD, J., dissents.