ATLANTIC–PACIFIC OIL COMPANY OF MONTANA, RE-
SPONDENT, *v.* GAS DEVELOPMENT CO., ET AL., APPEL-
LANTS.

(No. 7,556.)

(Submitted January 5, 1937.   Decided February 2, 1937.   Resubmitted on
Rehearing April 8, 1937.   Decided May 24, 1937.)

[69 Pac. (2d) 750.]

2

Mr. *F. G. Huntington* and Mr. *D. L. O'Hern,* for Appellants, submitted a brief; Mr. *O'Hern* argued the cause orally.

4

*Mr. R. G. Wiggenhorn,* for Respondent, submitted a brief, and argued the cause orally.

8

MR. JUSTICE MORRIS delivered the opinion of the court.

Plaintiff brought this action, in the nature of a suit to quiet title, seeking to have certain contracts relating to the production and recovery of oil and gas adjudged to be valid.

The case was tried before the court sitting without a jury. Findings of fact were proposed and requested by the plaintiff, and requested, but not proposed, findings were submitted on behalf of the defendants. The court made and filed findings of fact and conclusions, and thereafter both parties objected in writing to certain of the findings and conclusions. The findings and conclusions as made by the court were thereafter modified in conformity with some of the objections on behalf of the plaintiff. Judgment was thereupon entered in conformity with the findings and conclusions of law as thus made. The judgment awarded plaintiff the relief sought by it. The appeal is from the judgment. The facts in the case are in nowise in serious dispute.

Between December, 1926, and February, 1928, there were issued at one time or another oil and gas prospecting permits by the United States, four in number, one to each of four permittees whose identity is not important. These permits described lands located in what is referred to as the Baker-Glendive Gas Field. The total acreage in these permits was approximately 2,000 acres. The defendant John Wight secured an irrevocable power of attorney from each permittee authorizing him to contract with reference to these permits. Acting under such powers of attorney, Wight executed operating agreements upon each of these permits in the names and on behalf of each of the permittees, respectively, with Herbert Stokes. These agreements were subsequently ratified in writing by the permittees themselves. These operating agreements are the subject-matter of the controversy here in issue. They were identical except as to parties, dates, and descriptions. By their terms the permittee agreed that he had not assigned his permit or done any act which rendered it subject to cancellation; that he would upon request apply for extensions of time within which to comply with the permit, and that he would do no act which would in-

validate the permit or render it subject to cancellation. The permittee granted to Stokes "the sole exclusive right to enter upon the lands described" in the permit, to prospect the same for oil and gas, to apply to the United States for a permit to drill the premises and cause the same to be drilled for oil and gas during the term for which the permit was granted or extended, "and in all things to comply with the rules and regulations which have been or which may be imposed by the Department of the Interior relative to the drilling of oil and or gas wells on public lands." Stokes agreed to pay the entire cost of all the drilling and to save the permittee harmless from any claim or demands arising out of the drilling of every name, nature or description, the drilling operations to be under his sole and exclusive control. Stokes agreed to pay the royalties due to the United States, and to pay a royalty to the permittee on the oil and gas produced and recovered of $7\frac{1}{2}$ per cent. where the royalty to the United States was 5 per cent., and all other lands a royalty of $2\frac{1}{2}$ per cent. The right was granted to Stokes to purchase all oil and gas produced and saved from the premises at the field prices.

Provision was made that assignments of royalty were not to be binding on Stokes unless he was furnished with a certified copy thereof. Stokes was accorded the right to use oil and gas for drilling operations without cost. He agreed that if oil or gas in commercial quantities was found, he would proceed with due diligence to develop the premises to the maximum production commensurate with the market conditions. The right was granted to Stokes to apply to the Department of the Interior in his own name for such lease or leases as he might be entitled to from the United States under his contract and permit, such leases to be subject to the reservations of royalty contained in the agreement. The contract provided that Stokes might, if he determined the premises were not suitable for the production of oil or gas in commercial quantities, at his election abandon the contract and surrender all rights thereunder upon giving written notice. Upon the failure of Stokes to keep and perform the terms and conditions of the contract it was subject to cancella-

tion at the option of the permittee. The contract was made "subject to the approval of the Secretary of Interior and the right to assign by Stokes was made subject to the consent of the Secretary of the Interior if his consent was necessary." It was stipulated that the agreement and all its covenants inured to the benefit of the successors, heirs, and assigns of the parties respectively.

By various assignments these various operating agreements became the property of the plaintiff in this action. Stokes was the managing officer of the plaintiff corporation. In January, 1930, a contract was entered into between the plaintiff and the Capital Gas Corporation relating to these permits. It was a lengthy document, but it provided for the drilling of gas wells by the latter corporation on a large number of permits held by the plaintiff in this gas field, including the four involved in this suit, and called for the production and marketing of gas at a stipulated rate of compensation to the plaintiff. Pursuant to this agreement, during the summer of 1930, producing gas wells were drilled upon each of the four permits here involved. Sometime in 1931 the plaintiff herein asserted that the defendant Capital Gas Corporation had defaulted in its contract and commenced an action to cancel the same, which after trial resulted in a judgment, entered in November, 1932, canceling the Capital Gas Corporation contract and restoring the possession of the lands and the wells thereon to the plaintiff. This judgment was received in evidence in this case, and we are not further concerned with this defendant.

While the suit against the Capital Gas Corporation was pending, written notices of cancellation of the operating agreements were signed by their respective permittees, and likewise by John Wight. These notices of cancellation did not state any ground or reason for this action; they were not served until February 8, 1933. On February 20, 1931, the defendant Montana Eastern Pipe Line Company was organized and soon thereafter assignments of the permits in question were made to this defendant by the permittees and John Wight. As we gather from the record, John Wight was the managing officer of this corpora-

tion as well as of the Capital Gas Corporation. The offices of the Capital Gas Corporation and of the defendant Montana Eastern Pipe Line Company were maintained in the same rooms in the same office building, and the officers of each corporation were substantially the same. These officers had personal knowledge of the existence and terms of these operating agreements. The defendant Montana Eastern Pipe Line Company was not a party to the suit canceling the contracts of the defendant Capital Gas Corporation. The stockholders of the two corporations were apparently not identical.

Thereupon followed a controversy before the Department of the Interior which resulted in a lease or leases being issued to the defendant Montana Eastern Pipe Line Company to the lands described in these permits. The department declined to determine the controversy between these parties as to the validity of the operating agreements, and relegated the parties to the courts for adjudication of that question. These leases, as we understand the ruling of the department, were issued subject to any rights plaintiff might be able to establish in the courts. This action has for its purpose the adjudication of these rights. The plaintiff company at one time or another held, under similar operating agreements, many thousands of acres of land on the same structure. The Secretary of the Interior had before him copies of these operating agreements prior to his decision. He did not expressly approve them, nor did he expressly disapprove them. So far as the record discloses, he did not recognize them.

The findings of the court are lengthy. By its conclusions of law it decided that the operating agreements were valid and effective, and legal, outstanding, and binding upon the defendants; that the defendant Montana Eastern Pipe Line Company took the assignment of the permits subject to the outstanding agreements and the rights of the plaintiff thereunder; that the lease or leases granted by the Secretary of the Interior to the Montana Eastern Pipe Line Company are subject to the operating agreements; and that the plaintiff, subject to the terms and conditions of these agreements, had the exclusive right to operate the lands and premises under the oil and gas lease without

restriction from the defendants. By its further conclusions the court fully sustained these operating agreements and the right of the plaintiff to proceed thereunder. The judgment is in conformity with the findings of fact and conclusions of law.

Before proceeding to the consideration of the case on its merits, questions of practice have been raised which we will first determine. The defendants secured various extensions of time within which to serve and file a proposed bill of exceptions. Under the last extension the time granted by the trial court was in excess of the 60-day period in addition to the statutory time of 15 days, and therefore could only be made upon affidavit showing the necessity for such further time, pursuant to the provisions of section 9390, Revised Codes. The record discloses that the order was made "upon presentation of affidavit of D. L. O'Hern, one of the attorneys of record for the defense of this action." Nowhere in the bill of exceptions appears this affidavit. Counsel insists that we are without jurisdiction to hear this appeal, except as to matters appearing outside the bill of exceptions, namely, the judgment roll, unless this affidavit is incorporated in the bill of exceptions, relying upon the decision of this court in the case of *O'Donnell* v. *City of Butte,* 72 Mont. 449, 235 Pac. 707, 708. Some language appears in that case which justifies the contention of counsel. However, the statement of the facts found in that decision reveals the following: "The record does not disclose that any affidavit showing the necessity for further time for the presentation of a bill of exceptions was ever filed or presented to the court." Here the order discloses that an affidavit was filed on which the trial court based its order. The order showing that it was based on an affidavit was sufficient to cause the presumption to arise that the court had jurisdiction; in other words, it will be presumed, in the absence of a showing to the contrary, that the affidavit was sufficient to invoke the discretion of the trial court. In the *O'Donnell Case* there was nothing in the record to cause that presumption to arise; in other words, to apply the same rule in the *O'Donnell Case,* this court would have had first to presume that an affidavit seeking the order had been filed, and then base on

that presumption a further inference that it was a sufficient affidavit. Under the familiar rule that a presumption cannot be based upon a presumption, this court arrived at a correct conclusion in the *O'Donnell Case;* but in view of the difference between the state of the records in the two cases, what was there said is not here controlling. Accordingly, we hold that we may consider the bill of exceptions.

It is contended that the specifications of error are insufficient to raise some of the questions argued in the brief. In the various specifications of error it is asserted that the court erred in denying defendants' exceptions to certain findings, in making certain conclusions, in entering judgment, and in making certain findings of fact; and in this connection it is argued that the defendants are in no position to urge the insufficiency of certain findings, in that findings were not requested or properly excepted to within the provisions of sections 9369 and 9370, Revised Codes. The argument made by defendants is in effect, briefly stated, that the evidence is insufficient to support or warrant the findings and conclusions in certain respects, and, therefore, the evidence is insufficient to support the judgment. These sections, with reference to findings, deal with the absence of findings and defective findings, that is, omissions—issues raised which are not decided by the findings. Here defendants attack the findings for what they declare. In such case the rules announced in these sections have no application. (*Ferguson* v. *Standley,* 89 Mont. 489, 300 Pac. 245; *Cobban* v. *Hecklen,* 27 Mont. 245, 70 Pac. 805, 806.)

A specification of error to the effect that the court erred in entering judgment for the plaintiff and granting to the plaintiff affirmative relief was sufficient to raise the question of the insufficiency of the evidence to support the judgment. (*Bowles Livestock Com. Co.* v. *Midland Nat. Bank,* 94 Mont. 467, 23 Pac. (2d) 967.)

The chief argument on behalf of the defendants is that under the operating agreement it did not become valid and binding until such time as it was approved by the Secretary of the Interior. The argument is based upon the following language

appearing in this agreement: "This contract is made subject to the approval of the Secretary of the Interior."

The foregoing part of this opinion is adopted from the majority opinion handed down February 2, 1937. A rehearing was granted for the reason that grave doubt existed as to whether the clause in the operating agreements, quoted above, had been correctly construed to be a "condition precedent" or not. On further consideration the writer is satisfied that such clause does not constitute a condition of any nature but is a mere covenant.

It has been suggested that we are confined to the definition of a "condition precedent" by that provided by statute, section 7402, Revised Codes; that it is useless to resort to other jurisdictions for further illumination of the subject in so far as the definition is concerned. Section 7402 is not a home product. It is adopted in toto from the jurisdiction of California and will be found, word for word, in section 1436 of the Civil Code of that state; and it was not original with California but came from the old original Field Code of New York, sec. 678. Obviously, we have no proprietary right in the definition, and it has no peculiar meaning here unless we arbitrarily clothe it with our own view of what it means and how it shall be construed in disregard of the opinions of the courts in the jurisdictions from which it comes. And so far as the statutory definition is concerned, courts wrangled over the same question that we have here back in the early days of the judicial history of the country as will be shown by the citations which we will presently give. In any event, the phrase is not a localism that has only such meaning as we of this jurisdiction choose to arbitrarily give it. Moreover, the definition is of little value in the controversy here, but is merely relied upon in the endeavor to get at the intentions of the parties to the operating agreements, as it is well established that the intentions of the party or parties determine whether a provision in any instrument is a condition precedent, concurrent, or subsequent, or merely a covenant.

In 12 C. J., page 409 (note 35) it is said: "Conditions have no idiom—Whether they be precedent or subsequent is a ques-

tion purely of intent; and the intention must be determined by considering not only the words of the particular clause, but also the language of the whole contract as well as the nature of the act required, and the subject matter to which it relates.'' The New Standard Dictionary defines an ''idiom'' as ''Special character; Peculiarity.'' Webster's New International defines it as ''Peculiarity; special nature.'' If, as Corpus Juris says, conditions have no idiom, it means, of course, that they have no special peculiarities or characteristics; no unchangeable application or meaning that will justify a court in construing a clause in a contract as a condition precedent, except where the contract as a whole clearly and expressly shows such to be the intention of the parties.

That courts generally have found that stereotyped forms of definitions are of little value and that others have met the same difficulty that has arisen with us, is abundantly demonstrated by the books. In spite of the fact that nearly all, if not all, states have statutory definitions of ''conditions,'' as the term is applied to provisions of various instruments, courts continue to strive to illuminate the meaning of such terms with definitions of their own.

The following definition of a ''condition precedent'' has the support of many authorities: ''A 'condition precedent' is one that is to be performed before the agreement becomes effective, and which calls for the happening of some event or the performance of some act after the terms of the contract have been agreed on, before the contract shall be binding on the parties.'' (*Mumaw* v. *Western & Southern Life Ins. Co.*, 97 Ohio St. 1, 119 N. E. 132, 133, 135; *Rogers* v. *Maloney*, 85 Or. 61, 165 Pac. 357, 358; *Yerger* v. *Simmons*, 136 La. 280, 67 So. 3, 6; *Sunshine Cloak & Suit Co.* v. *Roquette Bros.*, 30 N. D. 143, 152 N. W. 359, 362, L. R. A. 1916E, 932; *Metropolitan Life Ins. Co.* v. *Goodman*, 10 Ala. App. 446, 65 So. 449; *Northwestern Nat. Life Ins. Co.* v. *Ward*, 56 Okl. 188, 155 Pac. 524, 526; *Lilly* v. *Haynes Co-op. Coal Min. Co.*, 50 N. D. 465, 196 N. W. 556, 559; *Franklin* v. *Parks*, 77 Okl. 280, 188 Pac. 334, 335, and many others.)

The following definition of a "condition subsequent" is accepted in substance by most authorities: " 'Condition subsequent' operates upon the estate already created and vested, rendering it liable to be defeated, if condition is broken." (*Hall* v. *Quinn*, 190 N. C. 326, 130 S. E. 18, 20.)

The difficulty arises when any attempt is made to fit the definitions to a state of facts arising out of a controversy as to whether certain provisions of instruments constitute a condition or not. The decisions following come from California and New York as a rule, and as our statutory definition comes from those sources, we rely with no little confidence upon the conclusions of those courts in the premises. Conditions are not favored in law. (*Front Street M. & O. R. R. Co.* v. *Butler*, 50 Cal. 574; *Cullen* v. *Sprigg*, 83 Cal. 56, 64, 23 Pac. 222, 225; *Deacon* v. *Blodget*, 111 Cal. 416, 44 Pac. 159; *Antonelle* v. *Kennedy & Shaw Lumber Co.*, 140 Cal. 309, 319, 73 Pac. 966, 968; *Shaw* v. *Caldwell*, 16 Cal. App. 1, 6, 115 Pac. 941; *Richardson* v. *Hislop*, 109 Cal. App. 440, 293 Pac. 168, and cases cited; *Union Indemnity Co.* v. *Lang*, (C. C. A.) 71 Fed. (2d) 901, 906; *Gramer* v. *City of Sacramento*, 2 Cal. (2d) 432, 41 Pac. (2d) 543; *Munro* v. *Syracuse, L. S. & N. R. Co.*, 200 N. Y. 224, 93 N. E. 516, 21 Ann. Cas. 594.)

In *Cullen* v. *Sprigg*, supra, it was said: "Contracts and laws declaring a forfeiture must be strictly construed, and a forfeiture can never take place by implication, but *must be effected by express, unambiguous language. * * * An estate upon condition cannot be created by deed, except when the terms of the grant will admit of no other reasonable interpretation.*" (Italics supplied.)

In *Antonelle* v. *Kennedy & Shaw Lumber Co.*, supra, it was said: "It is well settled that such conditions are not favored by the law, and are to be strictly construed against one seeking to avail himself of them."

Another California court said: "Courts are disinclined, as was observed by the Court of Appeals of New York ( [*Tipton* v. *Feitner*] 20 N. Y. 423), to construe the stipulations of a contract as conditions precedent, *unless compelled by the language*

*of the contract plainly expressed,"* (*Front St., etc., v. Butler, supra*), and "particularly so when the result would be to work a forfeiture." (*San Diego Const. Co. v. Mannix,* 175 Cal. 548, 166 Pac. 325, 329.)

A condition precedent or subsequent is not a question of phrase or form but of the intention of the parties. (*Markham v. Hufford,* 123 Mich. 505, 82 N. W. 222, 81 Am. St. Rep. 222, 48 L. R. A. 580; *Barruso v. Madan,* 2 Jones (N. Y.), 145; *Connecticut Fire Ins. Co. v. Jeary,* 60 Neb. 338, 83 N. W. 78, 51 L. R. A. 698; *Dunham v. Toledo-Detroit R. Co.,* 238 Mich. 596, 214 N. W. 156, 159; *De Conick v. De Conick,* 154 Mich. 187, 117 N. W. 570, 22 L. R. A. (n. s.) 417; *Scott v. Roethlisberger,* 178 Mich. 581, 146 N. W. 307; *Nowak v. Dombrowski,* 267 Ill. 103, 107 N. E. 807, 808; *Zweig v. Sweedler,* 140 App. Div. 319, 125 N. Y. Supp. 171; *Kerens v. St. Louis Union Trust Co.,* 283 Mo. 601, 223 S. W. 645, 11 A. L. R. 288; *Burdis v. Burdis,* 96 Va. 81, 30 S. E. 462, 70 Am. St. Rep. 825; *Finlay v. King,* 3 Pet. (28 U. S.) 346, 374, 7 L. Ed. 701.) In the last-cited case Chief Justice Marshall, speaking for the court, said: "There are no technical appropriate words which always determine whether a devise be on a condition precedent or subsequent. The same words have been determined differently; and the question is always one of intention."

Whether a provision of a contract or deed is a condition or a covenant depends on the intention of the parties. (4 R. C. L., sec. 290; *Stockton v. Weber,* 98 Cal. 433, 439, 33 Pac. 332; *Congregational Church Bldg. Soc. v. Everett,* 85 Md. 79, 36 Atl. 654, 60 Am. St. Rep. 308, 35 L. R. A. 693; Wharton on Contracts, 555; *Richardson v. Hislop, supra,* at page 318; *Union Indemnity Co. v. Lang, supra;* 2 Elliott on Contracts, sec. 1580; *Bank of Suisun v. Stark,* 106 Cal. 202, 39 Pac. 531; *Antonelle v. Kennedy & Shaw Lumber Co., supra.*) In the case last cited it was said: "But, aside from these considerations, we are satisfied that the stipulations of the parties in the contract upon this whole subject were not conditions precedent, but, in effect, simply covenants. As said by Parsons: 'Words of proviso and

condition will be construed into words of covenant when such is the apparent intent and meaning of the parties.' (Parsons on Contracts, vol. 2, sec. 511.) * * * The construction depends upon the intention of the parties, to be collected in each particular case from the terms of the agreement itself, and from the subject-matter to which it relates. Whether a provision in a contract is a stipulation * * * or a condition * * * is to be gathered from the whole document.''

Conditions must be strictly construed. (*Antonelle* v. *Kennedy & Shaw Lumber Co.*, supra; *Front Street etc. R. Co.* v. *Butler*, supra; *Cullen* v. *Sprigg*, supra; *Deacon* v. *Blodget*, supra; *Schwab* v. *Bridge*, 27 Cal. App. 204, 149 Pac. 603; *Tilley* v. *King*, 109 N. C. 461, 13 S. E. 936.) When in doubt whether a clause in a deed is a condition precedent, a condition subsequent, or a covenant, courts will construe it as a covenant. (*Carder* v. *Hughett*, 243 Ill. App. 170; *Earle* v. *Rehmann*, 214 Iowa, 784, 243 N. W. 345; *Walker* v. *W. T. Smith Lumber Co.*, 226 Ala. 65, 145 So. 572; *White Land Co.* v. *Christenson*, (Tex. Civ. App.) 14 S. W. (2d) 369; *Fraley* v. *Wilkinson*, 79 Okl. 21, 191 Pac. 156; *Sheets* v. *Vandalia R. Co.*, 74 Ind. App. 597, 127 N. E. 609; *Rooks Creek Ev. Luth. Church* v. *First Luth. Church*, 290 Ill. 133, 124 N. E. 793, 7 A. L. R. 1422, and annotation; *Norfolk Bank for Savings & Trust* v. *Whipple*, (D. C.) 254 Fed. 195; *Columbia Railway, Gas & Elec. Co.* v. *South Carolina*, 261 U. S. 236, 43 Sup. Ct. 306, 67 L. Ed. 629; *Carroll County Academy* v. *Trustees Gallatin Academy*, 104 Ky. 621, 47 S. W. 617; *Patterson* v. *Patterson*, 135 Ky. 339, 122 S. W. 169; *Freer* v. *Glenn Springs Sanitarium*, 131 App. Div. 352, 115 N. Y. Supp. 734, affirmed 198 N. Y. 575, 92 N. E. 1085; *Dempwolf* v. *Greybill*, 213 Pa. 163, 62 Atl. 645; *Los Angeles University* v. *Swarth*, (C. C. A.) 107 Fed. 798, 54 L. R. A. 262; *Munro* v. *Syracuse, L. S. & N. R. Co.*, 200 N. Y. 224, 93 N. E. 516, 21 Ann. Cas. 594; *Nowak* v. *Dombrowski*, supra.) In the case last cited it is said: ''The distinction between conditions precedent and subsequent is obvious in its consequences, but it is not always easy to determine which of these estates the words create. *Phillips* v. *Gannon*, 246 Ill. 98, 92 N. E. 616, and cases cited.

What will or will not constitute a condition in a deed is often a matter of nice construction. It is sometimes difficult to determine whether such provisions annexed to the agreement constitute a condition covenant, restriction, [or a] limitation or trust imposed on the property. If from the language employed it is doubtful whether the clause is a condition or covenant, it will be construed to be a covenant.'' (*Koch* v. *Streuter*, 232 Ill. 594, 83 N. E. 1072; 2 Devlin on Real Estate, 3d ed., sec. 970b.)

In construing doubtful conditions the court prefers conditions subsequent to conditions precedent, but conditions subsequent, in order to be relied on to work forfeitures, *must be created by express or clear implication and construed strictly* (Washburn on Real Property, 6th ed., secs. 941, 942). *When the terms of the grant admit of any other interpretation, they will not be held to create an estate on condition.* (1 Jones on Real Property, sec. 632; *O'Neil* v. *Caples*, 257 Ill. 528, 101 N. E. 50.)

A logical application of these established rules to the contract between the parties impels the conclusion that the controverted clause in the operating agreements is not a condition but a promise or covenant.

A ''covenant'' is an agreement between parties to do or not to do a particular act. (*Lowery* v. *May*, 213 Ala. 66, 104 So. 5; *Rooks Creek Ev. Luth. Church* v. *First Lutheran Church*, 290 Ill. 133, 124 N. E. 793, 7 A. L. R. 1422.) A ''condition'' differs from a covenant. ''A condition is created by mutual agreement of the parties and is binding on both; whereas a covenant is an agreement of the covenanter only.'' (12 C. J., p. 401, sec. 2.) ''The difference between a covenant and a condition relates largely to the remedy. If the breach of the agreement pertains to the validity of the instrument or is a ground of forfeiture, it is a condition; but, if the remedy for a breach is merely an action at law for damages, then the agreement is a covenant. The legal responsibility for non-fulfillment of a covenant is that the party violating it must respond in damages. The consequence of non-fulfillment of a condition is a forfeiture of the estate.'' (12 C. J., p. 402.)

If either Stokes or Wight or their associates, or any of their assignees had done anything to cause the permits to be canceled by the Department, the party whose act caused the cancellation would have been liable in damages to the other. Such contention is too well established in law to admit of doubt. No such right would exist if the controverted clause in the agreement were a condition.

True, paragraph 10 of the operating agreements provided that failure of Stokes to keep and perform the terms of the agreements rendered them subject to cancellation at the option of Wight, but that provision created an obligation between Wight and Stokes and their respective assignees, not between Stokes and the Department. Wight did not pause to have the question of Stokes' failure to keep the terms of the agreements legally determined, but assumed to revoke the agreements on his own volition. The decision of the Department (Plaintiff's Exhibit 7) holds that the Montana Eastern Pipe Line Company, Wight's assignee, following the attempt to cancel the agreements with Stokes, took the assignment of the permits subject to the Stokes agreements, provided the Pipe Line Company had notice of the Stokes agreements when it took such assignment, and such notice was clearly established in this action. Such being the situation, even if the controverted clause were a condition, it was not acted upon by any of the parties to the agreements or by the Department. Wight did not make it a ground for his attempt to cancel the agreements with Stokes; the Department did not recognize the cancellation, did not attempt to invoke any condition set out in the agreements between the parties, but made it clear that the Pipe Line Company held the lease subject to the agreements with Stokes, if that company had notice of the Stokes agreements. In short, no one gave or attempted to give life to any "condition precedent" or "subsequent" in the operating agreements, except this court in the original opinion. The only act by any party that affects the agreements between Wight and Stokes is the act of Wight in the attempt to cancel the agreements and the assignment of the permits to the Pipe Line Company in violation of the Stokes agreements. Wight

still has a right of action against Stokes for damages, if he can show any act of Stokes in violation of the agreements by which he, Wight, has been damaged. In reference to Wight and Stokes as the contending parties, no mention is made of their respective assignees and other parties involved in the controversy, for the sake of brevity.

The parties to the operating agreements could have made an equally binding contract by inserting a provision, "It is understood and agreed that each of the parties herein will respectively comply with all such regulations of the Department of the Interior as are necessary to obtain an oil and gas lease," and the meaning would have been the same.

It is obvious that the defendants construed the controverted clause of the operating agreements as a promise or covenant, and not as a condition precedent, as defendants did not rely thereon, but relied upon the remedy provided by the contract, paragraph 10 thereof, in which case we think the rule laid down in *Rosenthal Paper Co.* v. *National Folding Box & Paper Co.*, 175 App. Div. 606, 162 N. Y. Supp. 814, applies here. It was there said: "Where, from a consideration of the whole instrument, it is clear that one party relies upon his remedy and not upon the performance of the conditions by the other, such performance is not a 'condition precedent'; but where the intention was to rely upon the performance of the promise, and not on the remedy, the performance is a 'condition precedent.' "

Paragraph 10 of the operating agreements provides that, "Failure on the part of the party of the second part [Stokes] to keep and perform the terms and conditions of this agreement shall render it subject to cancellation at the option of the party of the first part," [Wight]. Wight depended and acted on this remedy when he undertook to cancel the operating agreements, and not upon any failure of the plaintiff or his assignee to comply with the so-called "condition precedent" relative to the approval of the Secretary of the Interior.

Taking another view of the "condition precedent" theory: It has been held in substance that a qualified applicant cannot be refused a permit, nor can regulations impair such right to a

permit to explore for oil and gas on federal lands, and mandamus will lie to enforce the applicant's right thereto. (*West* v. *United States ex rel. Alling,* 58 App. D. C. 329, 30 Fed. (2d) 739.) To hold that an agreement containing the clause, "subject to the approval of the Secretary of Interior," gives rise to no contractual liability between the parties until such agreement is approved by the Secretary is, in our opinion, in direct conflict with the above decision. Mandamus lies only to compel the performance of a ministerial duty. (*State ex rel. School District No. 29* v. *Cooney,* 102 Mont. 521, 59 Pac. (2d) 48, and cases cited.) The right to approve or disapprove the operating agreements here, as contended for under the theory that the clause quoted is a condition precedent to any contractual liability between the parties, is a discretionary power which may not be controlled by mandamus under the case just cited.

The minority presents a "commonplace illustration" to portray the "fallacy" of our conclusions. The illustration is quite inapt. It presents the case of a man laboring under the handicap of not being the master of his own acts; of a case where the individual inclined to invest in a pleasure-seeking vehicle, must bow before sovereignty before he may presume to spend his cash for a car. The illustration is not a fortunate one to present the constituent elements of a condition precedent. Conditions relate to the subject-matter of a contract, deed, or will, not to the contractual ability of a party. The illustration merely refers to an individual who made up his mind but has not the power to contract without special permission; a mere dreamer of a hope that he may gain permission to act; his contract is entirely in the offing, merely in contemplation. Here we have a full and complete executory contract; the subject-matter is specifically stated; the parties are designated, their respective duties and powers defined; the nominal consideration named and its receipt admitted, and the real consideration provided for with measured nicety. The mutual promises of the parties to do all things necessary to acquire a government lease are vital elements of the agreement; the promises to observe the regulations of the Department are made, ostensibly, as much a part of the

agreements as the promise to do no thing that might jeopardize or make impossible the obtaining of a lease, but the clause is not an essential part of the agreements; it refers to regulations of the government. The operating agreements would have been fully as binding upon the parties if the clause had been omitted entirely; the parties would be just as fully bound to observe the regulations of the government if no mention had been made of such regulations in the operating agreements. Governmental regulations cannot be varied or evaded by private contract, and the insertion of the controverted clause in the agreements was a useless gesture. It adds nothing to nor takes anything from the expressed and implied obligations of the parties as set out in the operating agreements.

Passing to other phases of the controversy, it must be kept in mind that the parties to the action at bar are contending for the right to a lease from the Interior Department by reason of development work performed upon the permitted lands by the Capital Gas Corporation, and the record shows that such development work was done by that corporation pursuant to its drilling contract with the plaintiff. It appears that the Montana Eastern Pipe Line Company, on the strength of the development work done by the Capital Gas Corporation, applied to the federal Land Office for leases under the permits; the decision was adverse to the Pipe Line Company, and it appealed, first, to the commissioner and, then, to the Secretary of the Interior. The decision of the First Assistant Secretary of the Interior on the appeal, Plaintiff's Exhibit 7, directed the leases to issue to the applicant, Montana Eastern Pipe Line Company, defendant, but said, ''The action of the permittees in declaring their operating agreements with Herbert Stokes canceled need not necessarily be regarded as binding upon Stokes and his assigns, even in the absence of the decree referred to. *The permittees entered into these operating agreements, and unless such agreements are finally declared canceled any assignment the permittees subsequenty made would be subject thereto, assuming that the assignees had no knowledge of the agreements.*'' (Italics supplied.)

The record clearly shows that the assignees did have knowledge of the assignments to Stokes. It is also shown that the validating operations on the strength of which the Montana Eastern Pipe Line Company was granted the lease, were performed in their entirety by the Capital Gas Company under its agreement with the plaintiff. It further appears that practically all the material contentions of the Montana Eastern Pipe Line Company presented in its application for a lease, wherein it challenged the rights of the plaintiff were not favorably considered by the commissioner, and on the appeal to the Secretary of the Interior there again such contentions were found to be untenable by the First Assistant Secretary. The lease, however, was granted to the Montana Eastern Pipe Line Company, subject to the rights of the plaintiff under the operating agreements. It appears clear from the decision that all the plaintiff is now required by the Department to do to entitle it to the relief sought is to show that the Montana Eastern Pipe Line Company, which became the assignee of the permits after the attempt to cancel the operating agreements with Stokes, took the permits with knowledge of the agreements with Stokes. The plaintiff, of course, must show that a majority interest in the corporation is held by citizens; that it is not attempting, directly or indirectly, to get or hold more than 2,560 acres of land under permits on the structure, nor more than 7,680 acres in the state; that the oil and gas rights will not be separated but held by the same party, and that the several royalties are properly protected, and comply with other regulatory measures; but we are here concerned only with the question first mentioned: Did the Montana Eastern Pipe Line Company have knowledge of the outstanding operating agreements with Stokes when it took the assignment of the permits? The solution of the other questions does not come under our jurisdiction but will be determined by the Department of the Interior.

We deem it advisable to mention other phases of the controversy which tend to support our conclusion. Paragraph 10 of the operating agreements provides for cancellation on failure of plaintiff to keep and perform the terms of the agreements, the

right to take advantage of such failure being at the option of the first party, Wight, as the authorized attorney of the permittees. Wight, in conjunction with the permittees, gave the notices of cancellation, and, in giving the notices, assigned no reason for the act, nor specified the particular way or manner in which plaintiff had failed to comply with any provisions of the agreements. Before any right to cancel could arise or be exercised, we think it was necessary that Wight, and possibly the permittees, give timely notice and call attention or show wherein Stokes or his assignees had failed to comply with such agreements. In the case of *Papoose Oil Co.* v. *Rainey*, 89 Okl. 110, 213 Pac. 882, the court went so far as to hold that before equity will grant a forfeiture for breach of implied covenants in a lease, the lessor must notify the lessee of the breach and demand compliance with the covenants. Every party is entitled to his day in court before he may be legally deprived of any property right. In the attempted cancellation of the operating agreements, Stokes was given no hearing; no attempt was made to have the respective rights of the parties legally determined, but Wight and the permittees arbitrarily assumed to reinvest themselves with full power over and control of the permits by cancellation of the operating agreements, and in doing so clearly violated paragraph 10 of such agreements. Hence, admitting, for the sake of argument, that the agreements carried a condition precedent, the defendants by their own breach caused the default of the plaintiff of which they now complain. It is obvious that if Wight and the permittees had not violated the agreements with Stokes in the manner mentioned, and encumbered the records of the Department with their antagonistic claims, the plaintiff would have obtained the lease without controversy. The defendants are thus placed in the position of one who complains of the failure of another to comply with the terms of an agreement, where the alleged failure is due to his own acts. A party cannot take advantage of his own breach, nor of the default of the other party which he has occasioned. It was said in *Burnham* v. *Bennison*, 126 Neb. 312, 253 N. W. 88, 94: " 'We are not weakening that principle of law' which

requires unconditional performance of conditions precedent, 'but we are asserting another rule, equally as old and equally as binding, when we declare that, where a person interested wrongfully prevents the performance of the condition precedent, he shall not be allowed to take advantage of his own wrong.' "

We find no material error in the record, and the judgment of the trial court is affirmed.

MR. JUSTICE ANGSTMAN, Concurring Specially:

I concur in the result announced in the opinion of Mr. Justice Morris, but not with all that is stated in it.

I think too much effort has been expended in placing the proper label on the clause "subject to the approval of the Secretary of the Interior," and not enough in an attempt to ascertain the intention of the parties in its use. The construction of this clause virtually determines the merits of this controversy. The troublesome clause appears in the last paragraph of the contract, which reads: "This contract is made subject to the approval of the Secretary of the Interior and the right to assign it, in whole or in part, by the second party [being Herbert Stokes], subject to the consent of the Secretary of the Interior, if his consent is necessary, is reserved to the second party."

This clause in the operating agreement was evidently placed in the contract because of the federal statute (Act Feb. 25, 1920, sec. 27) as amended, Title 30, U. S. C. A., sec. 184, reading in part as follows: "No person, association, or corporation shall take or hold at one time oil or gas leases or permits exceeding in the aggregate seven thousand six hundred and eighty acres granted hereunder in any one State, and no more than two thousand five hundred and sixty acres within the geologic structure of the same producing oil or gas field. * * * And provided further, That * * * if any of the lands or deposits leased under the provisions of this subchapter shall be subleased, trusteed, possessed, or controlled by any device permanently, temporarily, directly, indirectly, tacitly, or in any manner whatsoever, so that they form a part of * * * control in excess

of the amounts of lands provided in this subchapter, the lease thereof shall be forfeited by appropriate court proceedings.''

The operating agreement here purported to give to plaintiff's predecessor the right to take oil or gas from the lands in question upon payment of royalty to the government and to the permittees. Before this could be done a lease must have been obtained from the Secretary of the Interior. The record shows that the practice of the Department of the Interior is not to limit the acreage which any person, association, or corporation may hold under prospecting permits, but that the statute above referred to restricting the acreage is applied when leases are sought after oil or gas is discovered. Consequently, when the permittees offered plaintiff's predecessor in interest a percentage of the oil or gas, that offer required the approval of the Secretary of the Interior; but that approval would come when a lease was applied for, after oil or gas was discovered. I think that was the only purpose of this clause.

When section 11 of the contract is read in its entirety it is apparent that the contracting parties had doubt as to the extent of the authority of the Secretary of the Interior with respect to such contracts. This is shown by the use of the clause ''if his consent is necessary.''

I agree with Mr. Justice Morris that the provisions of section 11 did not create a condition precedent. If it was intended that the Secretary's approval was a condition precedent, I think that intention would have been clearly expressed. If it was intended that mere silence on the part of the Secretary of the Interior would prevent the contract from being effective, is it not strikingly strange that the contract does not provide who shall take the initiative in attempting to secure his approval?

If the above clause had the effect now claimed by appellant, is it reasonable to suppose that the parties would have left the contract silent as to how the Secretary's approval must be expressed, or when it should be obtained, or how the parties were to obtain notice and knowledge thereof, so as to be advised as to the effective date of their contract? Even a city ordinance

containing similar language has not been given this construction. (*Doty* v. *Lyman,* 166 Mass. 318, 44 N. E. 337.)

Here the parties to the operating agreement recognized it as effective. Plaintiff proceeded thereunder to do the promised drilling, by contract with the Capital Gas Corporation, and did everything necessary to enable the permittees to obtain leases. The permittees recognized the contract as in operation, because they later served notice of its cancellation. If it never became effective, why did it require any action to effect its cancellation? Moreover, the Secretary of the Interior has recognized the contract as being in effect. It was submitted to the Secretary of the Interior shortly after its execution. The Secretary extended the permits from time to time upon the operator's representations, accepted the drilling requirements of the permits, and on the strength thereof actually authorized the issuance of leases on the premises. To all intents and purposes the Secretary of the Interior has held that these operating agreements were effective. In a proceeding before the Secretary of the Interior involving the question whether he should issue a lease to the Montana Eastern Pipe Line Company, over protest of plaintiff that, if issued, it should be made subject to the operating agreements, that official held as follows: "The permittees entered into these operating agreements, and unless such agreements are finally declared canceled, any assignment the permittees subsequently made would be subject thereto, assuming that the assignees had knowledge of the agreements."

I think these operating agreements, as between the parties thereto and their assigns, were effective without the expressed approval of the Secretary of the Interior. Furthermore, the Secretary of the Interior has gone as far as he can to approve of them.

I can see no analogy between this case and the illustrations given in the dissenting opinion. Neither do I believe the clause in question can be construed as a covenant. I think it simply means that if the Secretary's consent or approval of the contract was essential to give it validity under the law, then his re-

fusal to consent or approve would operate to release the parties from the obligations of the contract.

I think the parties by the language used in section 11 of the contract as well as by their conduct so regarded it. This, perhaps, leads to the conclusion that the condition was a condition subsequent, but I am not so much concerned with the legal label that is applied to it, as I am at arriving at the intention of the parties as ascertained from the language used and their conduct in acting under it. When these are considered it brings me to the same conclusion announced in the opinion of Mr. Justice Morris, and I therefore concur in the result reached in his opinion.

MR. CHIEF JUSTICE SANDS:

I concur in the views expressed by Mr. Justice Angstman above.

MR. JUSTICE ANDERSON:

I dissent. The utility of a dissenting opinion has long been doubted. The chief beneficiary of their promulgation is the public printer, and thereby an additional burden is placed upon the taxpayer and the buying public. Bearing these conclusions in mind, I shall record my views as briefly as possible.

The majority of the court has agreed upon a result but is divided within itself upon the reasons for arriving at a decision. The diversity of opinion is upon the meaning to be given to the words appearing in the closing paragraph of the contract, namely: "This contract is made subject to the approval of the Secretary of the Interior." Mr. Justice Morris advances the view that by these words a covenant or promise was made, and that their effect was to declare that the parties to the contract would be bound by rules and regulations promulgated by the Secretary of the Interior. Mr. Justice Angstman asserts that these words are not a covenant, but in effect a condition; that if it is a condition precedent it has been waived; and if a condition subsequent, it has not been broken. Both, therefore, conclude that the contract is valid and binding.

It appears clear from a reading of the contract and these words that a condition precedent was created. It is useless in this jurisdiction to resort to adjudicated cases for a definition of a "condition precedent" or of a "condition subsequent," as they are defined by statute. Section 7402, Revised Codes, provides: "A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed." Section 7404 declares: "A condition subsequent is one referring to a future event, upon the happening of which the obligation becomes no longer binding upon the other party, if he chooses to avail himself of the condition."

A "covenant" is nothing more than a promise. The distinction between a promise, or covenant, and a condition as to the effect, is well stated by Professor Williston in his work on Contracts, Revised Edition, section 665, where it is written: "The distinction between a promise or covenant, on the one hand, and a condition on the other, both in their legal effect and in their wording, is obvious and familiar. Breach of promise subjects the promisor to liability in damages, but does not necessarily excuse performance on the other side. Breach of nonoccurrence of a condition prevents the promisee from acquiring a right, or deprives him of one, but subjects him to no liability. Words appropriate to promise and to condition make this distinction, which is clear in the legal effect produced, also clear as a matter of English construction."

"The language of a contract is to govern its interpretation if the language is clear and explicit." (Sec. 7529, Rev. Codes.) In the case of *Story Gold Dredging Co.* v. *Wilson*, 99 Mont. 347, 42 Pac. (2d) 1003, 1006, we said: " 'Where a contract is plain and clear in its terms, neither interpretation nor construction is permissible. * * * When the language employed by the parties "is free from ambiguity or uncertainty, it is beyond the power of the court to enlarge or restrict its application or meaning." ' (*McDaniel* v. *Hager-Stevenson Oil Co.*, 75 Mont. 356, 243 Pac. 582, 584, and cases cited.) 'Courts must enforce contracts as made, not make new ones for the parties, no matter

how unreasonable the terms may appear.' (*McConnell* v. *Blackley*, 66 Mont. 510, 214 Pac. 64.) ''

In the case of *State ex rel. Nagle* v. *Stafford*, 97 Mont. 275, 34 Pac. (2d) 372, 379, we had under consideration the meaning of the words "subject to confirmation," and in arriving at a conclusion said: " 'Subject to' means subservient or subordinate to (*Englestein* v. *Mintz*, 345 Ill. 48, 177 N. E. 746; *Byrne* v. *Drain*, 127 Cal. 663, 60 Pac. 433), and embodies the command that the act shall not be effective until the condition is complied with. Thus orders taken by a representative, 'subject to confirmation' by his house, do not ripen into contracts until confirmed (*Allen* v. *Simmons*, 97 W. Va. 318, 125 S. E. 86; *Royal Dairy Products Co.* v. *Spokane Dairy Products Co.*, 129 Wash. 424, 225 Pac. 412), and when a city council is authorized to extend and make changes in streets 'subject to' the approval of the mayor, the changes cannot be made until the mayor has acted, or the time within which he is permitted to act has elapsed. (*Makemson* v. *Dillon*, 24 N. M. 302, 171 Pac. 673.) ''

As an illustration of a condition as distinguished from a promise we find the following given in the Restatement of the Law of Contracts, section 260: "1. A insures B's house against fire. In the policy prepared and signed by A it is stated 'the insured is not to keep gasoline on the premises.' Refraining from keeping gasoline on the premises is a condition of A's promise. The words are not a promise by B."

The following commonplace illustrations serve to demonstrate the fallacy of the conclusions of the majority: If Jones meets Smith, who is a dealer in automobiles, and invites Smith for a demonstration, and at its conclusion Jones states to Smith, "I will buy this automobile subject to the approval of my wife," Smith demonstrates the automobile to Mrs. Jones who expresses neither approval or disapproval, no one would contend on this state of facts that Jones had purchased the automobile. If Brown and Henderson, who are attorneys each representing clients on different sides of a number of lawsuits pending between their respective clients, discuss the terms of settlement, draft and sign a stipulation embodying the details of the settle-

ment upon which they have agreed, but as a concluding paragraph to their stipulation they say, "This stipulation is entered into subject to the approval of the respective clients represented by the undersigned," again no one would seriously contend that the litigation was settled until approved by the principals.

According to the views of the majority, all of these illustrations would result in binding contracts without any approval.

It is difficult to imagine a clearer case of a condition precedent being expressed in a contract than the one in question. The contract was subservient or subordinate to the approval of the Secretary of the Interior, and his approval could be manifested by acts which sanction officially, ratified or confirmed the contract. Although the Secretary of the Interior knew of the contract, the record fails to show any acts on his part which would amount to sanctioning it officially, approving it or confirming it.

But has the condition of the contract been waived? Waiver is a matter of intention. It must be manifested in some unequivocal manner, and to operate as such it must in all cases be intentional. (*Williams* v. *Anaconda Copper Min. Co.,* 96 Mont. 204, 29 Pac. (2d) 649.) A mere silence at the time when there is no occasion to speak is not a waiver nor evidence from which a waiver may be inferred, especially where such silence is unaccompanied by any act calculated to mislead. (*Northwestern Fire & Marine Ins. Co.* v. *Pollard,* 74 Mont. 142, 238 Pac. 594.)

Under the foregoing rules, I am unable to say that this condition in the contract was waived. I think the judgment should be reversed.

Mr. Justice Stewart:

I concur in the dissenting opinion of Mr. Justice Anderson.

ON MOTION FOR REHEARING.

(Filed June 18, 1937.)

Opinion: PER CURIAM.

On petition for rehearing defendants contend that this court, ██ in order to do justice between the parties, ought to require plaintiff to reimburse defendants for expenditures made in preserving and protecting the property rights involved by paying compensatory royalties to the federal government and otherwise. We have given consideration to this contention and believe that the questions should first be presented to the trial court.

Accordingly, it is the view of this court that by appropriate supplemental or amended pleadings addressed to the trial court, these questions should be considered by the trial court, subject, of course, to any defense that the plaintiff may interpose, except the defense that such relief is barred by the decision in this case.

The petition for rehearing is denied.

ASSOCIATE JUSTICES STEWART and ANDERSON:

We dissent from the portion of the foregoing opinion denying the motion for a rehearing, and as to the residue we concur.